**NIVRAM CORP., on behalf of itself and all those similarly situated, Plaintiff,**

v.

**HARCOURT BRACE JOVANOVICH, INC., William Jovanovich, Ralph D. Caulo, Margaret Mary McQuillan, John F. Berardi, and Randall E. Krizek, Defendants.**

No. 92 Civ. 1712 (JMC).

United States District Court, S.D. New York.

Dec. 8, 1993.

Zachary Starr, Goodkind Labaton Rudoff & Sucharow, New York City, for plaintiff.

Sheldon Raab, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Defendants' motion to dismiss the complaint is denied. Fed.R.Civ.P. 12(b)(6).

## BACKGROUND

Plaintiff Nivram commenced the instant action on March 10, 1992, on behalf of a purported class of purchasers of Harcourt Brace Jovanovich ["HBJ"] preferred stock during the period March 30th through November 13, 1989. Nivram claims that the defendants misrepresented HBJ's ability to meet its current and future obligations in contravention of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, and section 20 of the 1934 Act. The defendants now move for the dismissal of these claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, interposing the statute of limitations as an affirmative defense. In brief, the defendants argue that the plaintiff had been put on inquiry notice, as a matter of law, of the facts underlying its claims for a duration in excess of the applicable statutory period, and that therefore, the plaintiff's claims are time-barred. For the reasons stated herein, the defendants' motion is denied.

The facts, as set forth in the public filings pertinent to this action, are as follows.[1] In May 1987, HBJ's board of directors adopted a recapitalization plan [the "Recapitalization Plan"].[2] There were three principal components of this plan. First, a special dividend was paid to the holders of common stock and to some holders of HBJ's 6⅞% Convertible Subordinated Debentures Due 2011. This special dividend consisted, on a per share basis, of $40 in cash and one share of a new series of preferred stock, par value $1.00 per share, designated 12% Preferred Stock. In the aggregate, this special dividend distribut-ed 1.6 billion dollars in cash and 40.5 million shares of 12% Preferred Stock.

Second, HBJ repurchased 4.3 million shares of its common stock and 18.8 million dollars in principal amount of its convertible debentures for 264.3 million dollars. As a result of this, in the second quarter of 1987, HBJ reported an extraordinary charge to income, net of taxes, of 11.2 million dollars.

Third, HBJ issued to its Employee Stock Ownership Plan Trust ["HBJ ESOP"][3] ten shares of a new series of preferred stock, designated as Ten Year Convertible Preferred Stock. These shares were later converted into 4.7 million shares of common stock. In June 1987, the HBJ ESOP purchased 4.8 million shares of common stock from HBJ for an aggregate purchase price of 49.3 million dollars. This transaction was financed by a loan from Southeast Bank, N.A. that was guaranteed by HBJ. In September 1987, funded by the cash proceeds that it had received in connection with the aforementioned special dividend, the HBJ ESOP purchased 10 million newly-issued shares of HBJ common stock for 99 million dollars.

In June 1987, HBJ issued 40,000 shares of a new series of preferred stock, designated as "Redeemable Exchangeable Escalating Rate Preferred Stock," to First Boston Securities Corp. ["First Boston"] for 83.6 million dollars.

In September 1987, in connection with the Recapitalization Plan, HBJ issued the following high-yield subordinated debentures: (1) 500 million dollars worth of 13¾% Senior Subordinated Debentures Due 1999, (2) 507.5 million dollars worth of 14¼% Subordinated Discount Debentures Due 2002, and (3) 250 million dollars worth of 14¾% Subordinated Pay-in-Kind Debentures Due 2002.

Also in connection with the Recapitalization Plan, HBJ's board of directors autho-

---

1. The scope of the Court's inquiry on a motion to dismiss is discussed *infra*. As will be discussed, the Court may review public disclosure documents that have been filed with the Securities and Exchange Commission ["SEC"].

2. Prior to its adoption of this plan, HBJ's board of directors rejected a proposal by another cor-poration to acquire HBJ at a price that the board deemed inadequate.

3. After January 1989, the HBJ ESOP and the Pension and 401(k) plans were categorized in the SEC filings under the nomenclature of the "Retirement Plan."

rized the issuance of the following three series of preferred stock, each of which were subject to mandatory redemption provisions: (1) 85 million shares of 12% Preferred Stock, (2) 40,000 shares of Exchangeable Escalating Rate Preferred Stock (described *supra*), and (3) 40,000 shares of 6% Convertible Preferred Stock.

The cash outlay for the Recapitalization Plan was, in turn, funded by a series of credit transactions and equity issuances. These transactions included the following: (1) a credit agreement entered into on July 27, 1987, as amended from time to time, under which 1.6 billion dollars of credit was ultimately extended to HBJ (excluding borrowings under the revolving credit facility), (2) a 901.4 million dollar bridge loan from First Boston, which was later repaid through the net proceeds from the sale of three separate issues of high-yield subordinated debentures,[4] (3) the sale of the Exchangeable Preferred Stock to First Boston for 83.6 million dollars, and (4) the sale of common stock to the HBJ ESOP for 148.3 million dollars.

For the year ended December 31, 1987, HBJ charged to income 98.9 million dollars in expenses relating to the Recapitalization Plan, including (1) the accounting adjustments attributable to the write-down to market value of 4.7 million shares of common stock that had been contributed to the HBJ ESOP, and (2) the costs and fees relating to the procurement of bridge financing, including the associated legal, accounting, and investment banking costs.

In the fourth quarter of 1987, in accordance with the performing-assets sale requirement under the credit agreements, HBJ sold several of its subsidiaries. Included among the subsidiaries sold were businesses engaged in the production of business periodicals, trade shows, and the distribution of school supplies, for a total of $334,120,000.

HBJ also sold two television stations for a total of $10,750,000.[5]

Under the aforementioned credit agreements, HBJ had available a 1.45 billion dollar term-loan facility, a 250 million dollar revolving credit facility for working capital requirements, and a 200 million dollar bridge-loan facility. As of December 31, 1987, there was no outstanding indebtedness under the revolving credit facility, the bridge-loan facility had been retired, and there was outstanding indebtedness of 1.3 billion dollars under the term-loan facility.

In the fourth quarter of 1988, HBJ modified its capital structure through the implementation of a refinancing plan [the "Refinancing Plan"]. The Refinancing Plan had four principal components: (1) the issuance and sale through a public offering of 10.5 million shares of common stock for gross proceeds of 100 million dollars, the net proceeds of which were applied to reduce the indebtedness outstanding under the revolving credit facility, (2) the issuance and sale through a public offering of 200 million dollars in principal amount of Senior Notes Due 1997 and 200 million dollars in principal amount of 14¼% Subordinated Debentures Due 2004, the gross proceeds of which were used to repay the 400 million dollar principal amount under the term-loan credit facility, (3) the issuance and sale through a privately-negotiated transaction of 53.6 million dollars in principal amount of Convertible Subordinated Notes Due 1999, the proceeds of which were used to redeem all then-outstanding shares of the Exchangeable Preferred Stock,[6] and (4) the amendment of the credit agreement governing the revolving credit facility to extend the loan maturity and amortization schedule, to ease certain covenants, to reduce the term-loan principal amount, and to extend the maturity of and to increase the amount of the revolving credit facility.

4. The net proceeds from the sale of the three high-yield subordinated debentures totalled 965 million dollars.

5. These sales resulted in a net after-tax gain of $137,000,000.

6. The remainder of the Exchangeable Preferred Stock had previously been redeemed by obtaining 30 million dollars in financing through a revolving credit facility. Prior to the redemption of the Exchangeable Preferred Stock, HBJ had paid cash dividends of $13,530,000 in 1988 and $5,439,000 in 1987.

As of December 31, 1988, there was 136 million dollars of outstanding indebtedness under the revolving credit facility, and there was 879.8 million dollars of outstanding indebtedness under the term-loan facility.

In the last quarter of 1989, HBJ sold its six theme parks and related land holdings to a subsidiary of Anheuser–Busch Companies, Inc. for a total of 1.1 billion dollars. Under the agreement of sale, HBJ could receive up to 100 million dollars in additional value through its 50% participation in the net proceeds received, over a ten-year period, from certain sales of land. In addition, HBJ obtained waivers of certain financial covenants in order to permit the consummation of the sale, with such waivers being operative from September 30, 1989 through January 31, 1990.

In November 1989, HBJ used part of the proceeds from the sale of the discontinued operations to retire in full the term-loan facility, which at that time bore an outstanding obligation of 875.2 million dollars. HBJ also repaid in full its indebtedness under the revolving credit facility.[7] Effective January 31, 1990, HBJ entered into an amended and restated credit agreement with its lending banks for a 350 million dollar revolving credit facility. The termination date of the agreement was originally December 1, 1992. This agreement specified minimum quarterly requirements relating to working capital, cash flow for the servicing of long-term debt, fixed-charge coverage, and minimum total capitalization, and placed restrictions on capital expenditures, lease obligations, and certain payments, including cash dividends.[8] HBJ's obligations under this credit agreement were secured by substantially all the assets of HBJ and its subsidiaries. HBJ's guarantee of the HBJ ESOP loan was secured by the same, and contained similar covenants.

As of December 31, 1989, there was no outstanding indebtedness under the revolving credit facility, and the term-loan facility had been retired.

Beginning in February 1990, several securities suits were filed against HBJ and several of its present and former directors and officers. On February 28, 1990, an action on behalf of a purported class of purchasers of HBJ common stock during the period March 30, 1989 through November 28, 1989 was filed by Violet Klein in the United States District Court for the Southern District of New York. The complaint alleged that the defendants knew, or were reckless in not knowing, that HBJ, as a consequence of the 1987 Recapitalization Plan and the 1988 Refinancing Plan, would be unable to meet its current obligations through its regular cash flow without the sale of substantial assets, and that HBJ's public filings contained misrepresentations and omissions concerning such matters, in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

From February 25th through April 30, 1990, five other suits were commenced in the United States District Court for the Southern District of New York on behalf of purported classes alleging similar violations during substantially the same period of time. Purported class actions were filed on March 2, 1990 by both Steven Mukamel[9] and by Lilla Kahan; on March 7, 1990 by Frank Levy, as custodian for Joshua and Stephanie Levy; on March 15, 1990 by Frederick Rand and Ruth LeWinter; and on April 25, 1990 by Albert Rahmanan. The actions in the Southern District of New York were consolidated under the caption *"In re:* Harcourt Brace Jovanovich, Inc. Securities Litigation, 90 Civ. 1318 (JMC)."

On March 1, 1990, N. Mark Becker filed a purported class action, in the Superior Court of California for the County of San Diego, on behalf of purchasers of HBJ securities from November 4, 1988 through February 28, 1990. The complaint alleged violations of

---

7. In connection with the retirement of its outstanding indebtedness under the revolving credit facility, HBJ recorded an extraordinary loss of $32,287,000 (net of taxes) for the write-off of associated unamortized debt issuance costs.

8. The indentures contained in other HBJ securities also restricted the payment of dividends for as long as such securities remained outstanding.

9. Mukamel filed a notice of discontinuance on April 26, 1990.

sections 11, 12(2), and 15 of the Securities Act of 1933, as well as common-law claims. On March 2, 1990, N. Mark Becker filed a suit in the United States District Court for the Southern District of California on behalf of the same purported class, alleging violations of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. On August 6, 1990 the California state court action was dismissed without prejudice. On September 24, 1990, the California federal court action was likewise dismissed without prejudice.

The public filings also indicate that in 1990, HBJ engaged Smith Barney Harris Upham Co., Inc. as its financial advisor, for the purpose of finding alternatives for dealing with HBJ's highly-leveraged financial position. On January 24, 1991, HBJ announced the execution of a merger agreement with General Cinema Corp. ["GCC"], pursuant to which HBJ was to become a wholly-owned subsidiary of GCC. The merger was conditioned upon the following: (1) a two-thirds vote of the holders of HBJ Common Stock, and a majority vote of the holders of HBJ 12% Preferred Stock, (2) the completion by GCC of cash tender offers for HBJ's publicly-held debt securities, and (3) GCC's execution of agreements to acquire all of the outstanding 9¾% Convertible Subordinated Notes Due 1999.

On March 10, 1992, plaintiff commenced the instant suit in United States District Court for the Southern District of New York.

Defendants now move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants assert that the plaintiff's claims are time-barred, arguing that the plaintiff was on inquiry notice of the facts giving rise to its claim for a duration in excess of the applicable statutory period for bringing suit under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder. Plaintiff, in turn, does not address whether or not it was on inquiry notice; rather, the plaintiff contends that the one-year period for bringing claims under Rule

10b–5 runs from actual notice only, and not from inquiry notice.

## DISCUSSION

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the United States Supreme Court established a uniform federal statute of limitations for implied private causes of action brought under Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5. The Supreme Court, in *Lampf*, ruled that the limitation period provided by the express causes of action contained in the 1934 Act and the Securities Act of 1933—which requires that actions be commenced within one year after the discovery of the facts constituting the alleged violation, and within three years after such alleged violation occurred—also applies to private claims for misrepresentation under Rule 10b–5. *See Lampf*, 501 U.S. ——, 111 S.Ct. at 2778. By so doing, the Supreme Court, in *Lampf*, adopted the same one-year/three-year period of limitation for commencing private causes of action under Rule 10b–5 that the Second Circuit had previously employed in *Ceres Partners v. GEL Associates*, 918 F.2d 349, 364 (2d Cir.1990).

■ While the Supreme Court had no occasion to address the question of inquiry notice in *Lampf*,[10] the Second Circuit has considered this issue, most recently in *Menowitz v. Brown*, 991 F.2d 36 (2d Cir.1993). In *Menowitz*, the Second Circuit held that the one-year prong of the statute of limitations begins to run once the plaintiff is on inquiry or constructive notice, or actual notice, of the facts giving rise to his claim. *See id.* at 41. A duty to inquire arises "where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded," and knowledge of the fraud will be attributed to him "if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation." *Arm-*

---

**10.** The plaintiff in *Lampf* commenced suit after the three-year period of repose had run. *See* *Lampf*, 501 U.S. at ——, 111 S.Ct. at 2782.

*strong v. McAlpin,* 699 F.2d 79, 88 (2d Cir. 1983) (quoting *Higgins v. Crouse,* 147 N.Y. 411, 416, 42 N.E. 6 (1895)). Thus, the first question posed is whether a duty to inquire has arisen, and the second is whether the investigation conducted by the plaintiff in response thereto has been reasonably diligent. *See Lenz v. Associated Inns and Restaurants Co. of Am.,* 833 F.Supp. 362, 370 (S.D.N.Y.1993).

The defendants now move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint on the ground that the plaintiff was on inquiry notice, as a matter of law, for a duration in excess of one year before it commenced the instant suit. It is axiomatic that on a motion to dismiss the court must construe the complaint in the light most favorable to the plaintiff, and must accept as true all of the plaintiff's allegations of material fact. *See Market Street Ltd. Partners v. Englander Capital Corp.,* 92 Civ. 7434 (LMM), 1993 WL 212817, at *4 (S.D.N.Y. June 14, 1993) (citations omitted); *Bilick v. Eagle Elec. Mfg. Co.,* 807 F.Supp. 243, 247 (E.D.N.Y.1992). A court is to grant a motion to dismiss pursuant to Rule 12(b)(6) "only if it appears certain that under no possible set of facts would the plaintiff[ ] be entitled to relief." *Mirman v. Berk & Michaels, P.C.,* 91 Civ. 8606 (JFK), 1992 WL 332238, at *2 (S.D.N.Y. Oct. 30, 1992) (citing *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887 (2d Cir.1976)).

■ In some cases, it is apparent from the face of the pleadings that the plaintiff either knew or should have known that a fraud has been committed. *See Sperber Adams Assocs. v. JEM Management Assocs. Corp.,* 90 Civ. 7405 (JSM), 1992 WL 138344, at *3 (S.D.N.Y. June 4, 1992); *see also Mirman,* 1992 WL 332238, at *2. While a court, generally, should not look beyond the pleadings in deciding a motion to dismiss, "a district court 'may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these

public documents.'"[11] *Hottinger v. Amcoal Energy Corp.,* 89 Civ. 6391 (LMM), 1992 WL 349851, at *5 (S.D.N.Y. Nov. 10, 1992) (quoting *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)); *see In re General Dev. Corp. Bond Litig.,* 800 F.Supp. 1128, 1135 (S.D.N.Y.1992), *aff'd sub nom. Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993).

■ The Court is mindful that the defendants bear a "heavy burden" in establishing that the plaintiff was on inquiry notice as a matter of law. *See Phillips v. Kidder, Peabody & Co.,* 782 F.Supp. 854, 859 (S.D.N.Y. 1991). Inquiry notice exists only when "uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." United Resources 1988–I Drilling & Completion Program, 91 Civ. 8703 (RPP), 1993 WL 17464, at *5 (S.D.N.Y. Jan. 21, 1993) (quoting *Huang v. Sentinel Gov't Sec.,* 709 F.Supp. 1290, 1301 (1991)).

■ Defendants contend that plaintiff was on inquiry notice of the facts underlying its claims as of the second quarter of 1989, when public filings indicated that HBJ had sold its theme parks in order to satisfy its working capital requirements, thereby rendering nugatory HBJ's financial forecasts of one year before which had declared that a reduction of liabilities could be effected without the sale of substantial assets. Defendants further assert that the pendency of civil actions relating to the Recapitalization Plan constitute other indicia sufficient, together with these incorrect forecasts, to put the plaintiff on inquiry notice as a matter of law.

The relevant statements contained in the public filings include the following:

(1) In HBJ's 1988 Annual Report, William Jovanovich, in his letter to the shareholders, posited:

Can HBJ repay its obligations without now selling off major assets? Yes. . . . Can HBJ remain competitive in its three main enterprises—Publishing, Parks, and Insur-

11. Generally, a pleading "is deemed to include any document attached to it as an exhibit, Fed. R.Civ.P. 10(c), or any document incorporated in it by reference." *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985) (citations omitted).

ance—and at the same time reduce debt costs? Yes.... We shall continue to be the second largest owner of theme parks in the United States.

HBJ 1988 Annual Report, at 2. HBJ's corporate fiduciaries likewise expressed their belief in the 1988 Annual Report that HBJ had the ability to "generate sufficient cash flow from operations to meet its current and future obligations," and that its confidence was "based on continuing growth in operating income in all three of its businesses: Publishing, Parks, and Insurance." *Id.* at 44. In its Form 10–Q for the first quarter of 1989, HBJ repeated the above assurances. *See* HBJ Form 10–Q (1st Quarter 1989), at 14.

(2) In its Form 10–Q for the second quarter of 1989, HBJ announced that it had contracted to sell its theme parks and related land holdings. *See* HBJ Form 10–Q (2nd Quarter 1989), at 16. In this 10–Q, HBJ's corporate fiduciaries expressed their belief that HBJ would be able to generate sufficient cash flow in order to meet its current and future obligations through the sale of its assets and out of the revenues generated by current operations, as opposed to out of current operating revenues alone. *See id.* at 17.

(3) In its Form 10–Q for the third quarter of 1989, HBJ omitted its prior statement of assurance that it would be able to generate sufficient cash flow to meet existing and future obligations.

(4) In its Form 10–K for the year 1989, HBJ discussed the pending class action suits in the Southern District of New York, the Southern District of California, and the Superior Court of California, County of San Diego, and detailed the allegations in the respective complaints. *See* HBJ 1989 Form 10–K, at 6–7.

In its complaint, plaintiff Nivram characterizes HBJ's announcement of the sale of the theme parks and related land holdings as "a complete 'turn-around' from previous statements that HBJ would not sell major assets to service its debt load." Complaint, ¶ 32. Nivram also characterizes HBJ's representation concerning its ability to generate sufficient cash flow in order to meet its current and future obligations as being "in sharp

and obvious contrast to its prior reports and assurances." Complaint, ¶ 41.

Defendants assert that, in view of the plaintiff's allegations, the untimeliness of plaintiff's suit is manifest from the face of its complaint. In addition, defendants argue that insofar as knowledge of the public filings is imputed to the plaintiff, and such filings reveal, among other things, the pendency of civil actions, the plaintiff should be regarded as having been on inquiry notice of the material facts underlying its claims.

The Court is unable to conclude that the plaintiff was on inquiry notice of the facts underlying its claims prior to its commencement of the instant action. While such a determination is not precluded on a motion to dismiss, cases so holding have presented circumstances ineluctably leading to such a conclusion. For example, in *Menowitz v. Brown*, 991 F.2d 36 (2d Cir.1993), the Second Circuit affirmed the dismissal of a complaint pursuant to Rule 12(b)(6) where the attendant circumstances included a substantial and growing number of civil cases pending against the defendant; two pending purported class actions; an FTC investigation into the defendant's appraisal methods; a subpoena served by the United States District Attorney for the Southern District of Florida which sought information in connection with a grand jury investigation into the defendant's appraisal methods; and a seizure, by representatives of the New Jersey Real Estate Commission and the New Jersey Attorney General, of books and records in connection with suspected violations of the New Jersey Real Estate License Act. *See In re General Dev. Corp. Bond Litig.,* 800 F.Supp. 1128, 1136 (S.D.N.Y.1992), *aff'd sub nom. Menowitz v. Brown,* 991 F.2d 36 (2d Cir. 1993).

The courts have accorded certain factors considerable weight in determining whether a plaintiff was on inquiry notice of the facts underlying its claims. Foremost among these factors are the existence of criminal, and federal or state agency investigations, *see Mirman v. Berk & Michaels, P.C.,* 91 Civ. 8606 (JFK), 1992 WL 332238, at *2 (S.D.N.Y. Oct. 30, 1992) (granting motion

to dismiss where two of plaintiffs' investments were the subject of an IRS inquiry),[12] and the presence of factual discrepancies [13] in available documents. *See Block v. First Blood Assocs.*, 988 F.2d 344, 349 (2d Cir. 1993) (upholding grant of summary judgment where there were discrepancies between a private placement memorandum and a purchase agreement regarding the defendant's ownership of film rights, and whether the investment was tax-motivated or intended to turn a profit, and in light of plaintiff's sophistication); *Lenz v. Associated Inns and Restaurants Co. of Am.*, 833 F.Supp. 362, 373–76 (S.D.N.Y.1993) (plaintiff on inquiry notice as a matter of law where discrepancies existed between offering materials and oral representations, and plaintiff had testified at his deposition that he understood the oral representations to be in conflict with the offering materials, in combination with the following indicia: plaintiff had received a Schedule K–1 tax reporting form indicating that the partnership was unprofitable, in conflict with representations made within the offering materials; plaintiff was in receipt of a letter which stated that a condominium project was a possible, and not a guaranteed purchaser, in direct contradiction of an oral representation made to the plaintiff that a contract existed between the limited partnership and the condominium association; plaintiff was in receipt of an excerpt from a New York Times article describing the criminal conviction for fraud of the individual who had made the oral representations; and plaintiff was a sophisticated investor); *Bilick v. Eagle Elec. Mfg. Co.*, 807 F.Supp. 243, 254–55 (E.D.N.Y.1992) (plaintiff charged with knowledge where the terms of the written agreement signed by the plaintiff were inconsistent with oral representations made to the plaintiff at the time of sale, and where the pertinent financial information was not furnished by the defendant for a fifteen-year period; court, however, gave plaintiff leave to replead issue of fraudulent concealment). *But see Sperber Adams Assocs. v. JEM Management Assocs. Corp.*, 90 Civ. 7405 (JSM), 1992 WL 138344, at *3 (S.D.N.Y. June 4, 1992) (denying motion to dismiss where the court was able to reconcile an alleged inconsistency between the accountants' oral representation that they had personally investigated operation figures, and a divergent written representation in which they disclaimed personal knowledge of the assumptions underlying their financial forecasts, since a reasonable investor could conclude that the accountants had reviewed the underlying financial data, but were unwilling to accept legal responsibility for their conclusions). Additional factors upon which considerable weight is accorded include: actual reliance upon documents, including public filings, as set forth in the complaint; the assertion of virtually identical counterclaims in a prior lawsuit, *see House v. Hastings*, 91 Civ. 3780 (JSM), 1992 WL 44370, at *3 (S.D.N.Y.) (plaintiff on inquiry notice when allegations in the complaint followed virtually word-for-word the counterclaims that had been interposed in a suit filed two years earlier), *aff'd*, 979 F.2d 845 (2d Cir.1992); and the proximity in time of key events, *see Pomeroy v. Schlegel Corp.*, 780 F.Supp. 980, 983 (W.D.N.Y.1991) (the proximity between the time of the repurchase agreement and the

---

**12.** In *Mirman*, the two partnerships that the plaintiffs had invested in were also the subject of a prior suit which had been dismissed as untimely, and which had been handled by the same plaintiffs' attorney. However, in the instant action, the Court rejects defendants' assertion that the representation of plaintiff by the same attorney who had represented plaintiffs in suits arising out of the merger with GCC constitutes a factor to be considered in determining whether the instant plaintiff should be regarded on inquiry notice of the facts underlying its claims. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss, at 6 n. 4.

In addition, *Mirman* is distinguishable from the instant action on a number of grounds.

First, the *Mirman* holding was premised on plaintiffs' receipt of notice of an IRS inquiry, as was the case preceding *Mirman* which had been dismissed as untimely. Second, the two cases in *Mirman* stemmed from the same investments, while the suits arising from the GCC merger implicated separate issues and involved different violations of the securities laws than the suits brought in the wake of the Recapitalization Plan. Third, this indicium most properly goes towards actual notice, which cannot be established at this stage of the litigation.

**13.** The Court uses the term "discrepancy" to describe the presence of a material inconsistency between two or more purported statements concerning past or existing facts.

announcement of merger, in addition to the pendency of a suit, of which plaintiff had actual notice, gave rise to inquiry notice as a matter of law). Other indicia, although not ordinarily dispositive standing alone, include a sharp decline in stock price,[14] *see Phillips v. Kidder, Peabody & Co.,* 782 F.Supp. 854, 860 (S.D.N.Y.1991) (denying summary judgment where the stock price plummeted from 9 to 4⅞; plaintiff had heard of a shakeout in the personal computer industry (defendant's industry), and media had published stories concerning such shakeout), the pendency of civil suits, declining profits, *see In re Chaus Sec. Litig.,* 88 Civ. 8641 (SWK), 1990 WL 188921, at *3–*5 (S.D.N.Y. Nov. 20, 1990) (plaintiff was not on inquiry notice as a matter of law where a press release reported a decline in earnings and a proxy statement indicated that other shareholders had raised questions about the possibility of fraudulent statements, where the decline in profits was tempered by misleading statements in the 10–K Report such as "[i]t is axiomatic that flowing, dynamic companies such as ours will experience some disappointments; we were not immune from this. Now, we have made the capital improvements and added the key personnel to lay the groundwork for the future success of our Company."), and the dissemination of adverse press releases or news reports.

Of the above-listed factors, defendants have shown the pendency of a consolidated civil class-action litigation in the United States District Court for the Southern District of New York, and two purported civil class actions in the state and federal court systems of California, which as previously discussed, were dismissed without prejudice. Defendants have also shown a retrenchment[15] by HBJ from its prior position that no major assets needed to be sold in order to satisfy debt obligations, and that such obligations could be fully satisfied out of the proceeds from current operations—to a position that obligations could be satisfied out of the proceeds from the sale of discontinued operations, as well as out of the revenues generated by current operations.

■■■ Defendants' misrepresentations, as alleged by the plaintiff, are centered upon HBJ's failure to attain its financial forecast as announced in 1988 and in the first quarter of 1989. A financial forecast "may be regarded as a 'fact' within the meaning of [Rule 10b–5]."[16] *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489 (9th Cir.1974); *see also Goldman v. Belden,* 754 F.2d 1059, 1069 (2d Cir.1985) ("Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year.") (citations omitted). A forecast is actionable where, for example, there is a "gross disparity between prediction and fact," and where other misrepresentations and omissions underlie the forecast in question. *Marx,* 507 F.2d at 489 (quoting *G & M, Inc. v. Newbern,* 488 F.2d 742, 746 (9th Cir.1973)). Since a forecast "implies a reasonable method of preparation and a valid basis ... it would be 'untrue' absent such preparation or basis." *Marx,* 507 F.2d at 490; *see Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.) (error not to instruct jurors that "[a]n opinion or

---

14. This factor may be dispositive in an unsuitability claim under Rule 10b–5, since "it is the 'mere fact' of the decline value which forms the basis of plaintiff's claim." *Farr v. Shearson Lehman Hutton, Inc.,* 755 F.Supp. 1219, 1226 (S.D.N.Y.1991) (plaintiff was on inquiry notice of an unsuitability claim as a matter of law where communications revealed that the investments were risky, generated little or no income, and were projected to lose principal for investors).

15. The Court uses the term "retrenchment" to describe a statement, in writing or otherwise, that modifies or reappraises a previously issued forward-looking statement or financial forecast made by the same entity.

16. While culpability for statements of opinion, "puffery," or prediction is dubious under common-law principles of fraud, the doctrine of caveat emptor, which arguably precludes the actionability of such statements, applies "primarily in the sale of tangibles where it appears that examination by the purchaser may offset exaggerated statements and expressions of opinion by the salesman. It can have little application to the merchandising of securities. Particularly is this true under the anti-fraud provisions of the securities laws, which were designed to protect against sharp and inequitable practices whether or not they meet the requisites of common law fraud." *In re B. Fennekohl & Co.,* 41 S.E.C. 210, 1962 WL 3604 (S.E.C.), at *5 (Sept. 18, 1962).

projection, like any other representation, will be untrue if it has no valid basis") (citations omitted), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). This determination is entwined with the scienter [17] requirement and entails "an inquiry into the circumstances underlying the statement to ascertain whether or not the maker was guilty of some fault or otherwise culpable." *Marx,* 507 F.2d at 490. As the Supreme Court observed in *Durland v. United States,* 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), "[t]he significant fact is the intent and purpose." *Id.* at 313, 16 S.Ct. at 511 ("[Mail fraud statute] must be read ... to include[ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."); *see also Burns v. Paddock,* 503 F.2d 18, 23 (7th Cir.1974) ("[A] promise made with a deceptive intent violates the securities acts."); *United States v. Grayson,* 166 F.2d 863, 866 (2d Cir.1948) ("to promise what one does not mean to perform, or to declare an opinion as to future events which one does not hold, is a fraud."). "Where the statement in question is a pure statement of opinion ... [t]he 'material fact' is that the speaker honestly holds the opinion which he has expressed." *Franklin Savings Bank of N.Y. v. Levy,* 551 F.2d 521, 530 (2d Cir.1977) (Van Graafeiland, J., concurring in part and dissenting in part) (citations omitted). However, a forecast that in retrospect is not correct is not actionable for that reason alone; a forecast made with a "sound factual or historical basis," one that is "a reasoned and justified statement of opinion" will not serve to impugn the defendant. *Marx,* 507 F.2d at 489 (quoting *G & M, Inc.,* 488 F.2d at 745–46).

■ While HBJ's retrenchment from its former position ultimately may be shown to have constituted a fraudulent misrepresentation for purposes of Rule 10b–5, a forecast, and a subsequent abandonment or reapprais-

al thereof, is weak indicium that the plaintiff was on inquiry notice of the underlying misrepresentation. In the Court's view, deviation from a forecast is not to be accorded the same weight as a discrepancy between statements concerning past or existing facts for purposes of determining whether a plaintiff was on inquiry notice of a predicate act of misrepresentation. *Cf.* Suzanne J. Romajas, Note, *The Duty to Disclose Forward–Looking Information: A Look at the Future of MD & A,* 61 Fordham L.Rev. S245, S246 n. 13 (1993) (noting the general unwillingness of courts to impose Rule 10b–5 liability for the nondisclosure of forward-looking information, in stark contrast to the reaction of courts to an intentional or reckless misrepresentation or omission of a past or existing fact).

Moreover, plaintiff's acknowledgment of this retrenchment in its complaint does not transform this otherwise weak indicium into one that is indicative of fraud. While the running of the applicable statutory period may be manifest from the face of a complaint, mere inclusion of matter in a complaint says nothing of the weight accorded the indicia of fraud, if any, contained therein. The authorities cited by the defendants are not to the contrary.[18] For example, in *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402 (2d Cir.1975), the plaintiff was held to be on inquiry notice as a matter of law where the complaint alleged, among other things, that the American Stock Exchange had suspended trading in the defendant's stock in the over-the-counter market; that the stock price had plummeted from 8⅛ to 2½ over a five-month period; that a civil suit was pending; and that the SEC had obtained a consent order against the defendant company. *See id.* at 410; *see also Arneil v. Ramsey,* 550 F.2d 774, 781 (2d Cir.1977) (plaintiffs on inquiry notice as a matter of law where an advertisement that was placed by one of the

---

**17.** Scienter would not be established, for example, where evidence indicates that a defendant "exerted substantial efforts to bring these predictions to fruition." *Marx & Co. v. The Diners' Club, Inc.,* 550 F.2d 505, 515 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

**18.** While the cases that the defendants cite predate *Ceres,* they constitute good authority for a court's assessment of when the statute of limitations begins to run, as opposed to the separate matter of what the applicable statutory period is, since the former determination has long been a matter of federal law. *See Bresson v. Thomson McKinnon Sec., Inc.,* 641 F.Supp. 338, 351 (S.D.N.Y.1986).

defendants, claiming "fine financial shape," was followed by an admission by a second defendant in a publicly-issued SEC release of "willful" violations of the securities laws, and the first defendant was named by the New York Stock Exchange as one of five firms in "serious peril"); *Bresson v. Thomson McKinnon Sec., Inc.*, 641 F.Supp. 338, 345 (S.D.N.Y.1986) (plaintiff was on inquiry notice as a matter of law where documents misstating the defendant's financial position, including its use of significant leverage, and the nature of its partnerships, were followed by an announcement revealing, among other things, the company's projected losses, the planned sale of up to 33% of its reserves, the termination of all partnership sales, and a reduction in work force). In the instant case, this indicium of alleged fraud is further weakened by its coupling with assurances in the public filings which "conveyed the impression to investors that [defendant] was in a position ... to escape the adverse consequences [of its highly-leveraged financial position] and continue to grow and prosper." *Phillips v. Kidder, Peabody & Co.*, 782 F.Supp. 854, 862 (S.D.N.Y.1991).

In addition, the pendency of civil suits against HBJ is not enough to persuade the Court that the plaintiff was put on inquiry notice of the facts underlying its misrepresentation claims. In *Sperber Adams Assocs. v. JEM Management Assocs. Corp.*, 90 Civ. 7405 (JSM), 1992 WL 138344 (S.D.N.Y. June 4, 1992), in which, among other indicia, another civil suit had been filed, such pendency was not enough to place the plaintiff on inquiry notice in light of the fact that the other suit was not highly publicized, inasmuch as the court did not possess enough information at the motion-to-dismiss stage to make such a determination. *See id.* at *3. This was so even though the defendant had argued that the plaintiff was apprised of certain risks in the offering memoranda, and that there were purported inconsistencies between the oral and written representations that had been made by the accountants. *See id.*

In light of the above-discussed factors, the Court cannot say, on this motion to dismiss, that the plaintiff was on inquiry notice as a matter of law of the facts underlying its claims. The factors that the defendants point to fall far below the threshold required to establish inquiry notice. The Court finds the presence of the pending civil class-action litigation against the defendants, coupled with the defendants' "retrenchment" in its financial forecasting, insufficient to put the plaintiff on inquiry notice. Therefore, defendants' motion to dismiss the complaint must be denied.

## CONCLUSION

Defendants' motion to dismiss the complaint is denied. Fed.R.Civ.P. 12(b)(6).

SO ORDERED.