Anthony K. NEWMAN, On behalf of himself and all others similarly situated, David Sims, Thomas M. O'Hara, Merrill Balaban, Michael Ceasar, Steven Asher Asoulin, Patricia L. McMullan, Mark Naeyert, Fresno County Employees Retirement Associ-

ation, the Reams Asset Management Company and the Barbara Wilderman Irrevocable Trust, Consolidated–Plaintiffs–Appellants,

v.

WARNACO GROUP, INC., Linda J. Wachner and William Finkelstein, Defendants–Appellees,

Stanley P. Silverstein, Consolidated–Defendant–Appellee.

Docket No. 02–9157.

United States Court of Appeals, Second Circuit.

Argued: April 8, 2003.

Decided July 7, 2003.

Joseph J. Tabacco, Jr., Christopher T. Heffelfinger, San Francisco, CA (Berman DeValerio Pease Tabacco Burt & Puchillo; Marc I. Gross, Pomerantz Haudek Block Grossman & Gross, LLP, New York, NY; Glen DeValerio, Kathleen M. Donovan–Maher, Michael T. Matraia, Alicia T. Duff, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA; Frederick S. Fox, Robert N. Kaplan, Joel B. Strauss, Kaplan Fox Kilsheimer LLP, New York, NY; David Kessler, Marc Wilner, Shiffrin & Barroway, LLP, Bala Cynwyd, PA), for Consolidated–Plaintiffs–Appellants.

Steven M. Farina, Washington, DC (Kevin T. Baine, William T. Burke, Williams & Connolly LLP, Washington, DC), for Defendants–Appellees and Consolidated–Defendant–Appellee.

Before: WALKER, Chief Judge
WINTER, Circuit Judge, CARMAN, Chief Judge.[1]

CARMAN, Chief Judge.

Plaintiffs were stockholders of the Warnaco Group, Inc. ("Warnaco") during the class period September 17, 1997 through August 19, 2000. They brought this suit against Warnaco and the individual defendants for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000), Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240–10b–5, and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), based on allegations of fraud. In an opinion dated April 25, 2002, the district court dismissed Plaintiffs' cause of action against the individual defendants on the ground that the action was time-barred as a matter of law. Upon Plaintiffs' motion for reconsideration, the district court adhered to its original decision and denied Plaintiffs' motion for leave to amend their complaint. Plaintiffs' claims against Warnaco were voluntarily dismissed on July 31, 2002. Pursuant to Federal Rule of Civil Procedure 54(b), judgment was filed on September 9, 2002. Plaintiffs appeal the April 25, 2002 dismissal and accompanying September 9, 2002 judgment order, as well as the district court's order upon reconsideration and denial of Plaintiffs' motion to amend their complaint.

## Background

Warnaco is a manufacturer of intimate apparel and other clothes and accessories. During the class period, Defendant Linda Wachner was Warnaco's Chief Executive Officer, Defendant William S. Finkelstein was Warnaco's Chief Financial Officer, and Defendant Stanley P. Silverman was a Vice President and General Counsel of Warnaco.[2] Plaintiffs allege that during the class period, Warnaco's Forecasting and Planning Division would determine how much inventory to create each month by meeting with the individual defendants to forecast the number of sales in upcoming quarters. According to Plaintiffs, the forecasts were based on orders received from various department stores to which Warnaco sold its goods. Plaintiffs allege that Wachner forced the Forecasting and Planning Division to increase its sales projections beyond its attainable or actual sales projections. Plaintiffs maintain that the individual defendants "were aware of or recklessly disregarded various fraudulent practices that employees of [Warnaco] were undertaking" in order to meet the sales projections.[3] They also claim that as a result of these fraudulent practices, an enormous amount of excess inventory became obsolete and had to be written down in value or written off entirely in accordance with Generally Accepted Accounting Principles.

---

1. The Honorable Gregory W. Carman, Chief Judge of the United States Court of International Trade, sitting by designation.

2. The individual defendants were also stockholders of Warnaco. Plaintiffs alleged that the individual defendants were engaged in insider trading and fraudulent practices to inflate the price of their shares.

3. Such practices allegedly included calling customers and persuading them to accept new merchandise in the current quarter and then permitting the customers to return that merchandise in the next quarter if they could not sell it.

On April 2, 1999, Warnaco filed a revised Form 10–K ("1998 Form 10–K") with the Securities and Exchange Commission ("SEC") covering fiscal year 1998. Prior to filing the 1998 Form 10–K, Warnaco had adopted Statement of Position 98–5 ("SOP 98–5"), promulgated by the American Institute of Certified Public Accountants. SOP 98–5 requires the costs of start-up activities and organization costs to be expensed as incurred. In Note 1, page F–7 of Warnaco's 1998 Form 10–K, in a subsection entitled "Start–Up Costs," Warnaco indicated that:

> [i]n the fourth quarter of fiscal 1998, retroactive to the beginning of the year, [Warnaco] early adopted the provisions of SOP 98–5 requiring that pre-operating costs relating to the start-up of new manufacturing facilities, product lines and businesses be expensed as incurred. [Warnaco] recognized $46,250[,000], after taxes, as the cumulative effect of a change in accounting to reflect the new accounting and write-off the balance of unamortized deferred start-up costs as of the beginning of 1998. In addition, [Warnaco] recognized in fiscal 1998 earnings approximately $40,823[,000], before taxes, related to current year costs that would have been deferred under [Warnaco's] start-up accounting policy prior to the adoption of SOP 98–5. . . .

In the following subsection of Note 1 entitled "Adjustments, Reclassifications and Revisions," Warnaco restated certain financial information for the fiscal years 1996, 1997, and the first three quarters of 1998 as follows:

> [Warnaco] early adopted [SOP] 98–5 in fiscal 1998. In connection with the adoption of the new accounting standard, an extensive effort was undertaken to identify all start-up related production and inefficiency costs that had previously been deferred. Over the last six years, [Warnaco] has opened or expanded 10 manufacturing facilities. In addition, ... [Warnaco] opened 2 new manufacturing facilities during 1998 for a total of 12 new facilities. This resulted in [Warnaco's] incurring plant inefficiencies and other start-up related costs resulting from high turnover and related training and other costs. Such start-up related production and inefficiency costs have been classified in other assets and inventories. Because certain such costs identified in this process related to fiscal 1997 and 1996 activities, such prior year consolidated financial statements have been revised to reflect additional costs of goods sold of $57,017[,000] in fiscal 1997 ... and $37,983[,000] in fiscal 1996 .... In addition, fiscal 1998 results have been similarly adjusted to recognize such current year costs in cost of goods sold ($49,668[,000] or $32,135[,000] after tax) (See Note 18).

Note 18 included Warnaco's unaudited quarterly operations results. As a means of explanation, Note 18 stated that "[Warnaco's] fiscal 1998 quarterly results of operations have been revised with respect to the effects of the early adoption of SOP 98–5 and the accounting for other start-up related inventory production and inefficiency costs, as described in Note 1." Plaintiffs allege that these write-downs[4] "dramatically reversed" Warnaco's previously disclosed financial data.

PricewaterhouseCoopers LLP ("Pricewaterhouse") served as Warnaco's auditor during the filing of the 1998 Form 10–K. In its "Report of Independent Accoun-

---

4. In accounting, to "write-down" an expense is "to transfer a portion of the balance of an asset to an expense account due to a decrease in the value of an asset." Black's Law Dictionary 1609 (6th ed.1991).

tants," which was included as part of the 1998 Form 10–K, Pricewaterhouse indicated that "[a]s described in Note 1, pursuant to the adoption of SOP 98–5 [Warnaco] changed its accounting for deferred start-up costs effective the beginning of fiscal 1998 and revised its fiscal 1997 and 1996 consolidated financial statements with respect to accounting for other start-up related production and inefficiency costs."

Plaintiffs point out that the price of Warnaco common stock on April 1, 1999, the day prior to Warnaco's filing of the 1998 Form 10–K, was reported by Bloomberg at $24.94. On Monday, April 5, 1999[5], Bloomberg reported that Warnaco's common stock was $25.13. Bloomberg reported that Warnaco's stock remained in the twenties through September 14, 1999. Plaintiffs also cite to various articles and analytical reports published in the six-month period following the 1998 Form 10–K filing that they claim "consistently portrayed Warnaco in a positive light and also attributed the revision to the adoption of the new accounting standard."

On November 26, 1999, Warnaco filed SEC Form 8–K in which it reported that on November 18, 1999 Warnaco dismissed Pricewaterhouse as its independent auditor and hired Deloitte & Touche LLP. Warnaco also indicated that

> in connection with the audit of the fiscal 1998 consolidated financial statements, [Pricewaterhouse] informed management that the intimate apparel division manufacturing cost system may not function to reduce to a relatively low level the risk that errors may occur and

not be detected within a timely period. [Warnaco] took actions in fiscal 1998 which it believes have effectively addressed these matters.

Plaintiffs claim that this matter involving the intimate apparel division manufacturing cost system is a "material weakness" as defined in Statement on Auditing Standard No. 60.[6] Plaintiffs also claim that this "material weakness" was indicated for the first time in the Form 8–K.

On May 16, 2000, Warnaco filed another revised Form 10–K, which the Court will refer to as "1998 Form 10–K/A". While the 1998 Form 10–K/A reported the same write-downs to Warnaco's financial results, the explanation for the write-downs changed. Warnaco amended Note 1, now entitled "Reclassifications and Restatement," to read, in pertinent part, as follows:

> Prior to fiscal 1998, [Warnaco] rapidly expanded its manufacturing capacity, hiring and training over 15,000 new employees. This resulted in [Warnaco] incurring plant inefficiencies and higher than anticipated manufacturing costs characteristic of new manufacturing operations resulting from high labor turnover and related training and other costs. [Warnaco's] infrastructure, personnel and systems were overburdened by the size and scope of this rapid expansion and by the increased manufacturing volume. Manufacturing related costs, which were significantly higher than anticipated, were added to inventories when incurred. In connection with

---

**5.** April 2, 1999 was Good Friday and the market was closed.

**6.** Plaintiffs note that Statement on Auditing Standards No. 60 defines a "material weakness" as a "reportable condition in which the design or operation of one or more of the internal control components does not reduce

to a relatively low level of risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions."

the fiscal 1998 year-end closing, [Warnaco] determined that in fiscal 1996, 1997 and the first three quarters of 1998, as merchandise was sold, inventories were relieved at less than actual cost per unit, leaving an accumulation of inventory costs.... This restatement resulted from flaws in [Warnaco's] Intimate Apparel Division inventory costing [sic] control system that have since been addressed.

On May 16 and 17, 2000, Bloomberg reported Warnaco's common stock price at $8.56. On May 18, 2000, Bloomberg reported Warnaco's common stock price at $8.00. Plaintiffs list a series of announcements by Warnaco beginning on July 20, 2000 that allegedly further caused Warnaco's stock price to drop: 1) an after-tax charge in the second quarter of 2000 of approximately $60 million to $70 million, 2) a further reduction in inventory value and another restatement of Warnaco's financial results for 1997, and 3) the commencement on April 17, 2001 of an SEC investigation into Warnaco's financial statements.

On August 22, 2000, various plaintiffs, including the appellants, filed seven class action suits against Warnaco for securities law violations. On November 17, 2000, the district court ordered that the seven class action suits be consolidated. The Consolidated Amended Class Action Complaint was filed on March 22, 2001, and the Second Amended Class Action Complaint was filed on May 31, 2001.

The district court dismissed Plaintiffs' action against the individual defendants for expiration of the statute of limitations under § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e).[7] The district court found that the 1998 Form 10–K placed Plaintiffs on inquiry notice of the claims of fraud alleged in their complaint. First, the district court stated that

> [i]t is inconsistent for [P]laintiffs to argue, on the one hand, that the dramatically reversed financial data disclosed in the [1998 Form 10–K] shows that the previous statements were false and misleading, but on the other hand, that it could not have placed [P]laintiffs on inquiry notice of the fraud.

The district court was not persuaded that the 1998 Form 10–K would not place Plaintiffs on inquiry notice of inventory fraud, noting that the dramatic reversals in financial data and the language of the 1998 Form 10–K would have given sufficient inquiry notice. The district court also rejected Plaintiffs' argument that the 1998 Form 10–K did not give Plaintiffs inquiry notice because the reason Warnaco gave for the revisions was that it adopted a new accounting standard. The district court noted that the 1998 Form 10–K stated not only that SOP 98–5 had been adopted, but that there had been "an extensive effort" to "identify all start-up related production and inefficiency costs" and that "[s]uch start-up related production and inefficiency costs have been classified in other assets and inventories." Additionally, the district court found that the revised financial data in the 1998 Form 10–K related directly to the misrepresentations and omissions that comprise Plaintiffs' securities claims. Upon finding that Plaintiffs were on inquiry notice of the fraud, the district court concluded that Plaintiffs had a duty to investigate and failed to make reasonably diligent efforts to uncover the fraud within the statute of limitations. For these reasons, the district court dismissed Plaintiffs' action.

7. In light of its holding that Plaintiffs' action is time-barred, the district court did not address the issue raised by Defendants as to whether Plaintiffs properly pled compliance with the statute of limitations.

## Discussion

■ The statute of limitations for claims pursuant to section 10(b) of the Securities Exchange Act and SEC Rule 10b–5 is "within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e) (2000). "Discovery of facts for the purposes of this statute of limitations includes constructive or inquiry notice, as well as actual notice." *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000) (internal quotation marks omitted); *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993). "A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds*, 12 F.3d at 350.

■ As this Court noted in *Dodds*, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id.* The fraud must be probable, not merely possible. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 701 (2d Cir. 1994); *De La Fuente v. DCI Telecommunications, Inc.*, 206 F.R.D. 369, 381 (S.D.N.Y.2002).

> Since the Second Circuit follows the objective standard for inquiry notice, the information provided must trigger notice with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved .... The triggering financial data must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.

*Morin v. Trupin*, 809 F.Supp. 1081, 1097 (S.D.N.Y.1993) (internal citations, quotation marks, and alterations omitted). The issue that the Court must consider is not whether Plaintiffs in this case were given inadequate information about the alleged inventory fraud but whether Plaintiffs "had constructive notice of facts sufficient to create a duty to inquire further into that matter. An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds*, 12 F.3d at 351–52.

■ Defendants maintain that Plaintiffs were on inquiry notice of any alleged wrongdoing no later than April 2, 1999 when the 1998 Form 10–K was filed. Defendants point out that the 1998 Form 10–K and 1998 Form 10–K/A "restate [Warnaco's] financial results by *identical* amounts." Citing to Plaintiffs' argument before the district court that the "sheer magnitude" of the write-downs suggests a finding of scienter, Defendants argue that Plaintiffs knew the magnitude of these write-downs in April 1999. Defendants also dispute Plaintiffs' claim that they were not on inquiry notice of fraud because Warnaco attributed the revisions of Warnaco's financial statements to the adoption of SOP 98–5. Defendants maintain that the 1998 Form 10–K informed Plaintiffs of two separate write-downs: one relating to Warnaco's 1998 financial data and resulting from the early adoption of SOP 98–5, and another relating to Warnaco's 1996 and 1997 financial data and resulting from other start-up related inventory production and inefficiency costs. According to Defendants, Plaintiffs could have reached the conclusion that the 1996 and 1997 revisions could not have been based on SOP 98–5 in April 1999 because SOP 98–5 prohibits the restatement of previously issued financial statements. Additionally, Defendants claim that the 1998

Form 10–K revealed the bulk of the alleged insider trading by Defendants and the statements made within the class period that were allegedly contradicted and proven fraudulent by the 1998 Form 10–K.

We disagree with the district court and find that Plaintiffs were not placed on inquiry notice of any alleged fraud in April 1999 by the 1998 Form 10–K. Although Defendants attempt to distinguish between write-downs attributable to the adoption of SOP 98–5 and those attributable to other start-up related inventory production and inefficiency costs, this distinction was not presented in the 1998 Form 10–K with clarity sufficient to place Plaintiffs on inquiry notice that there was a probability of fraud. For example, when discussing start-up costs in Note 1, Warnaco indicated that the amount it recognized after taxes was based on *"the cumulative effect of a change in accounting* to reflect the new accounting and write-off the balance of unamortized deferred start-up costs as of the beginning of 1998." The fact that the next sentence provided the amount recognized after taxes "related to [fiscal 1998] costs that would have been deferred ... prior to the adoption of SOP 98–5" does not clarify that the first write-down is unrelated to the adoption of SOP 98–5 while the second write-down is based upon it, given that the first quoted sentence specifically refers to the change in accounting procedure. In the next subsection of the 1998 Form 10–K entitled "Adjustments, Reclassifications and Revisions," Warnaco indicated that it identified its start-up related production and inefficiency costs *"[i]n connection with the adoption of [SOP 98–5]."* Although Warnaco may not have relied upon SOP 98–5 as authority to revise its financial data for fiscal 1996 and 1997, the language of the 1998 Form 10–K implies to the reader that *but for* the adoption of SOP 98–5, the other start-up related production and inef-

ficiency costs would not have been detected or written down.

In any event, it does not appear from the 1998 Form 10–K that the cause of the start-up and inefficiency costs was fraud relating to inventory. In the 1998 Form 10–K, the write-downs were attributed to start-up and inefficiency costs related to new plant openings and expansions. There was no indication of flaws with Warnaco's forecasting, inventory cost control system, or any other fraud that led to the write-downs. It was reasonable for Plaintiffs not to inquire into Warnaco's statements because Warnaco had provided the seemingly benign explanation that it had changed accounting methods and revised its financial information for fiscal 1996 and 1997 because the "costs identified ... related to fiscal 1997 and 1996 activities." *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 155 (2d Cir.2003) ("There are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management.") While the Court acknowledges that notice of the *entire* fraud is not required for the investor to be placed on inquiry notice, *Dodds,* 12 F.3d at 352, the statements that Defendants point to in the 1998 Form 10–K did not contain *any* indication that fraud was being perpetrated. Simply because start-up related production and inefficiency costs are identified does not necessarily mean that those costs are the result of fraud. As noted earlier, the existence of fraud must be a probability, not a possibility. *Jackson Nat'l Life Ins. Co.,* 32 F.3d at 701; *Dodds,* 12 F.3d at 350; *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,* 840 F.Supp. 243, 249 (S.D.N.Y.1993) ("The Court is mindful that the defendants bear a heavy burden in establishing that the

plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.") (internal quotations and citations omitted).

The Court's holding is further supported by the fact that Warnaco's stock price did not have any significant movement following the filing of the 1998 Form 10–K. As Plaintiffs note, Warnaco's stock price actually increased following the filing of the 1998 Form 10–K. According to Bloomberg, from the beginning of April 1999 to the middle of September 1999, Warnaco's stock remained between approximately $24.00 and $30.00. For most of that time period, the stock price was above the $24.94 closing price for April 1, 1999. By contrast, following the May 16, 2000 filing of the 1998 Form 10–K/A, Warnaco's stock price progressively dropped from its closing price of $8.56 on May 16, 2000 and reached $6.75 on July 19, 2000. While some courts have pointed to a decline in stock price as.a factor supporting a finding of inquiry notice, *see, e.g., De la Fuente,* 206 F.R.D. at 384–85; *see also Nivram Corp.,* 840 F.Supp. at 252 (acknowledging that a sharp decline in stock price, though typically not dispositive standing alone, is a factor often considered in determining whether a plaintiff was on inquiry notice), there was no such decline following the issuance of the 1998 Form 10–K in this case. This information, when combined with the references to SOP 98–5 in the 1998 Form 10–K and the various articles and analytical reports of which the Court has taken judicial notice, demonstrates that inquiry notice was not triggered by the 1998 Form 10–K.

Because the Court holds as a matter of law that Plaintiffs did not have inquiry notice of the alleged fraud prior to August 22, 1999, we need not address Defendants' further argument that Plaintiffs did not act with reasonable diligence to discover the fraud. In addition, we decline to address Defendants' additional claims that Plaintiffs did not plead compliance with the statute of limitations and did not plead fraud with particularity. These claims may be raised by the defendants on remand for consideration by the district court in the first instance.

The judgment of the district court is vacated and the case is remanded.