Ernie DE LA FUENTE, on behalf of himself and all others similarly situated, Plaintiffs,

v.

DCI TELECOMMUNICATIONS, INC., Joseph J. Murphy, Russell B. Hintz, Larry Shatsoff, John Adams, Schnitzer & Kondub, P.C., Richard S. Kondub, and Ross J. Schnitzer, Defendants.

No. 01 Civ. 3365(CM).

United States District Court, S.D. New York.

April 23, 2002.

John H. Eickemeyer, New York City, for Schnitzer & Kondub, P.C., Richard S. Kondub and Ross J. Schnitzer, Vedder, Price, Kaufman & Kammholz.

Greenberg Traurig, LLP, Robert A. Horowitz, Karen Y. Bitar, New York City, for DCI Telecommunications, Inc., Joseph J. Murphy, Russell B. Hintz, Larry Shatsoff, and John Adams.

## DECISION AND ORDER

MCMAHON, District Judge.

### MEMORANDUM ORDER GRANTING DEFENDANTS' MOTION TO DISMISS IN PART, DISMISSING THE CLAIMS AGAINST THE ACCOUNTANT DEFENDANTS, GRANTING PLAINTIFFS' MOTION FOR A CONTINUANCE SO THAT DISCOVERY MAY BE CONDUCTED, DEFERRING DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT, AND GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The lead plaintiffs, the de la Fuente Group,[1] on behalf of itself and all others who purchased or acquired DCI Telecommunications, Inc., ("DCI") stock between April 21, 1998 and April 20, 2001, bring this action alleging fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs have also filed a motion for class certification.

Defendants Schnitzer and Kondub P.C., and its principals, Defendants Richard S.

---

1. The de la Fuente Group comprises proposed class representatives Bradley R. Gramm, Lee C. Bush, and Ernie de la Fuente.

Kondub and Ross T. Schnitzer (the "accountant defendants") have moved to dismiss plaintiffs' First Amended Class Action Complaint as time barred. DCI and individual defendants, Joseph J. Murphy, Russel B. Hintz, Larry Shatsoff, and John Adams (the "DCI defendants") have also moved to dismiss the complaint on the same grounds, as well as an additional ground that plaintiffs have failed to plead scienter adequately. Defendants submitted a joint memorandum of law in opposition to plaintiffs' motion for class certification, and the accountant defendants also filed a separate motion in opposition to class certification. The DCI Defendants have also made a motion for partial summary judgment.

Plaintiffs oppose the motion to dismiss on all grounds and seeks leave to replead should the Court determine that the First Amended Complaint is deficient. Plaintiffs also oppose the motion for partial summary judgment, and ask for leave to conduct discovery.

For the reasons set forth below, the accountant defendants' motion to dismiss is granted. The DCI defendants' motion to dismiss is granted, except as to the allegations relating to the Corzon stock dividend. Plaintiffs' motion for a continuance so that discovery may be conducted is granted, and the DCI defendants' motion for summary judgment on the remaining claim is deferred until that discovery is completed. Plaintiffs' motion for class certification is granted, but with a substantially modified class.

### Statement of Facts

The following facts are taken from the allegations in the complaint, which I must accept as true for the purposes of this motion to dismiss.

Plaintiffs, the de la Fuente Group, brought this action on April 21, 2001, on behalf of DCI stockholders who purchased their stock between April 21, 1998 and April 20, 2001. Defendant DCI is a Colorado corporation headquartered in Stratford, Connecticut. DCI went public in December 1994 through a reverse merger with Fantastic Foods International, Inc. Since the merger, DCI's primary business activity has been the acquisi-

tion of small, privately held companies in stock-for-stock transactions.

The Complaint alleges securities fraud based upon accounting irregularities with respect to ten corporate transactions that occurred between 1995 and 1999. Plaintiffs argue that DCI's financial statements were materially misleading because they failed to account for a number of transactions according to generally accepted accounting principles (GAAP), thereby overstating assets and revenues.

Plaintiffs claim that DCI and its auditors improperly accounted for various acquisitions in order to deceive the market into believing that DCI was in better financial health than it actually was. As a result, the value of DCI common stock was artificially inflated throughout the Class Period and investors suffered substantial losses when the truth concerning DCI was made public. Plaintiffs also allege that the inflated stock prices gave DCI an opportunity to raise $9 million in equity financing through Regulation D and Regulation S private placements. They allege that defendants' accounting fraud harmed investors who were led to believe that DCI was a vibrant company when, in reality, it was a collection of disparate subsidiaries.

### The Challenged Accounting Practices

Specifically, the accountings complained of are the following:

1. *DCI's January 1995 Acquisition of Alpha Products*

In January 1995, DCI acquired the assets of Alpha Products, Inc. ("Alpha") for 850,000 shares of DCI common stock. Plaintiffs assert that DCI improperly valued Alpha's principal asset, its customer base, at fair market value using the purchase method of accounting, when it should have valued the customer base at its historical cost because DCI and Alpha were under common control. (Compl. ¶¶ 19, 25.)

2. *DCI's February 1995 Acquisition of Casino Marketing*

On February 14, 1995, DCI acquired all of Casino Marketing, Inc.'s ("Casino Market-

ing") outstanding stock in exchange for 2.5 million shares of unregistered DCI stock. The DCI stock was to be placed in escrow to be paid to Casino Marketing quarterly, based on Casino Marketing's earnings. The DCI stock was never released from escrow, however, because Casino Marketing never generated any earnings. Plaintiffs allege that DCI improperly valued Casino Marketing's assets because the value of those assets should only have been recorded in proportion to the value of the DCI stock released to Casino Marketing and, because no stock was ever released, Casino Marketing's assets should have been valued at zero. (Compl.¶¶ 20, 25.)

### 3. Deferred compensation paid to certain DCI employees in the form of stock

In February 1995, DCI issued 1,250,00 shares of stock to three employees under the terms of their employment agreements. Plaintiffs allege that DCI improperly accounted for these shares as deferred compensation (an asset to be amortized over the six year term of the employment agreements). According to Plaintiffs, the shares should have been accounted for as an expense because the securities were issued as compensation for services already rendered in 1995. (Compl.¶¶ 21, 25.)

### 4. DCI's June 1995 Contract with R & D Scientific Corp.

In June 1995, DCI entered into a contract with R & D Scientific Corp. ("R & D") to acquire all of R & D's outstanding stock. Plaintiffs allege that DCI improperly recorded the acquisition in June 1995, because DCI never obtained the stock or effective control over R & D. (Compl.¶¶ 26–27, 32.)

### 5. DCI's agreement, in November 1996, to acquire the outstanding stock of Muller Media Inc.

In November 1996, DCI entered into a contract with Muller Media, Inc. ("Muller Media") to acquire all of Muller Media's outstanding stock. The agreement was conditioned upon the satisfaction of certain contingencies (a "put" option), and those contingencies were not met until June 9, 1998. Thus, plaintiffs allege that DCI improperly

recorded the acquisition in November 1996 when it should not have been recorded until June 1998. (Compl.¶¶ 34–35, 41.)

### 6. DCI's acquisition, on March 25, 1999, of all of the stock of Travel Source

In March 1997, DCI acquired all of the outstanding stock of Travel Source Ltd. ("Travel Source"), a Rhode Island travel agency, in exchange for 29,412 of DCI shares. Under the terms of the agreement, if the price of DCI stock fell below a certain point within six months, DCI promised to give additional shares in order to bring the purchase price up $100,000. According to plaintiffs, DCI improperly accounted for the Travel Source acquisition as a pooling of interests when it should have been recorded under the purchase method because of the contingency of additional consideration if DCI's stock price dropped. (Compl.¶ 36.)

### 7. DCI's acquisition of Card Call International Holdings

In March 1997, DCI acquired all of Card-Call International Inc.'s ("CardCall") outstanding stock in exchange for some DCI shares. Plaintiffs allege that DCI improperly recorded its acquisition of CardCall before final CardCall shareholder approval was given on May 29, 1997. (Compl.¶ 52.)

### 8. Edge Communications, Inc.

In April, 1998, DCI agreed to acquire all of Edge Communication, Inc.'s ("Edge") outstanding stock in exchange for 4,385,715 shares of unregistered DCI stock. Under the terms of the agreement, Defendant Murphy was given sole voting power for two years over the DCI shares delivered to Edge. (Compl.¶ 54.) According to plaintiffs, because the acquisition agreement restricted the voting rights of the Edge shareholders, DCI should have accounted for the acquisition under the purchase method of accounting instead of the pooling of interest method. (Compl.¶ 82.)

### 9. DCI's 1998 contract with IXC Communications, Inc.

In November and early December of 1998, DCI entered into a series of agreements

wherein IXC Communications, Inc. ("IXC"), a Texas-based telecommunications company, agreed to reinstate previously cut-off phone carrier services to DCI's prepaid phone card subsidiary, Edge, in exchange for unregistered DCI stock. DCI would have received a relatively valuable telecommunications switch, but that part of the transaction fell apart in December 1998. According to plaintiffs, DCI improperly valued the IXC agreements as an intangible asset by multiplying the market price of DCI's common stock on the day the agreements were executed by the number of shares exchanged. (Compl.¶¶ 56–60.) Plaintiffs allege that DCI should have used a discounted stock price reflecting the restricted nature of the IXC shares, and that DCI failed to recognize an impairment loss when a material aspect of the transaction did not take place. (Compl.¶ 82.)

### 10. DCI's Sale of a Subsidiary to Carlyle Corporation

In March, 1999, DCI agreed to sell its subsidiary, Cyberfax, Inc., to Carlyle Corporation ("Carlyle") in exchange for a $5 million promissory note. According to plaintiffs, Carlyle rescinded the agreement in April and, it was therefore improper for DCI to record the $5 million promissory note as an asset with a corresponding $5 million liability in its March 31, 1999 financial statements. In addition, plaintiffs allege that DCI never should have recorded the sale of Cyberfax to Carlyle in the first place because the primary incidents of ownership remained with DCI. Finally, plaintiffs allege that even without the rescission of the agreement, the sale of Cyberfax should have been accounted for by segregating the assets and liabilities of Cyberfax on DCI's balance sheet with a footnote disclosing the terms of the promissory note and uncertainties surrounding its collectability. (Compl.¶ 65–68, 82.) The sale of Cyberfax had no overall effect on DCI's reported net worth because the $5 million recorded asset was set-off by a corresponding $5 million liability. (Compl.¶ 68.)

### Additional Fraudulent Transactions

In addition to these ten allegedly fraudulent accounting practices, plaintiffs allege three additional frauds against the DCI defendants. Although the complaint refers to "defendants" generally, none of these allegations implicates the accountants defendants or can fairly be said to state a claim against them.

### 1. Sale of S–8 stock to the public

Plaintiffs allege that DCI was unjustly enriched and perpetrated a fraud on the market by causing its employees to sell S–8 stock to the public and then kicking back sales proceeds to DCI. Those unlawful transactions included at least $310,569 worth of S–8 stock that was funneled through Defendant Murphy and at least $52,956 that was funneled through other DCI employees at Defendant Murphy's direction in 1995 and 1996. (Compl.¶ 33.)

### 2. Defendant Murphy's Internet Chat Room Disclosures

In February and March of 1998, Defendant Murphy used a private internet chat room on the website siliconinvestor.com, purporting to disseminate inside information relating to DCI. Plaintiffs allege that this was an attempt to further the overall fraudulent scheme to deceive the market and DCI investors. (Compl.¶¶ 42–43.)

### 3. Corzon Stock Dividend

In January, 2000, DCI filed its Form 10–KSB, stating that it had sold Fone to Corzon (at that time called the Tanners Restaurant Group, Inc.) in exchange for 40,000,000 shares of stock and an assumption by Corzon of $3,453,652 of DCI debt. In its November 27, 2000 Form 8–K, DCI declared a one-time stock dividend, whereby one share of Corzon would be given to DCI shareholders for each share of DCI that they owned as of December 6, 2000. DCI reiterated this plan in a press release issued on that same date. In January, 2001, however, the company announced in its Form 8–K that it would be unable to distribute these shares until it amended its most recent SB2 registration statement. Plaintiffs claim that DCI has no intention of ever distributing the Corzon shares to its investors because it has been

selling these shares for its own benefit. (Compl. ¶¶ 87–93.)

## Motions to Dismiss

Defendants all contend that the facts underlying the complaint either occurred more than three years before plaintiffs brought suit on April 20, 2001, or that plaintiffs had inquiry notice of them more than one year prior to the commencement of this action.

In support of their motion, defendants state that DCI investors had access to a steady stream of information, beginning no later than May 1998 and extending through the summer of 1999, indicating that they probably had been misled regarding DCI's true financial condition. They cite: (1) two restatements of DCI's financial statements and associated amended Form 10–KSB filings, in which virtually all of the DCI acquisitions referred to in the Complaint were given revised accounting treatment; (2) a ten-day trading suspension ordered by the SEC, which explained in a release that the suspension was being imposed due to "questions regarding the accuracy and adequacy of DCI's financial statements, specifically DCI's apparent inflation of revenues by accounting for one or more business combinations as a 'pooling if interests'"; (3) a DCI press release that reiterated the SEC's reasons for the suspension, stated the DCI was restating the financial results for the first three quarters of the current fiscal year and confirmed that the previous restatements had been made pursuant to an SEC request; (4) a Form 10–KSB filed by DCI with the SEC on July 1, 1999, which further disclosed that the SEC was conducting an investigation of DCI, with which the company was cooperating; and (5) the decline in DCI's stock price from 2⅛ just prior to the SEC-imposed suspension on May 3, 1999, to 1/2 on September 30, 1999. (Horowitz Decl., Ex. T.)

## Conclusions of Law

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be· granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiffs. The Court is required to read a complaint generously, drawing all reasonable inferences from the complaint's allegations. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. General Electric Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). The Court must deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Stewart v. Jackson & Nash,* 976 F.2d 86, 87 (2d Cir.1992) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Generally, a court should not look beyond the pleadings on a motion to dismiss the complaint. However, publicly-filed documents may be considered, and customarily are in securities fraud cases. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *Giant Group, Ltd. v. Sands,* 142 F.Supp.2d 503, 505 (S.D.N.Y.2001) ("For purposes of a motion to dismiss, the Second Circuit has deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing suit."). Information about DCI's stock price may also be considered. *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 166 n. 8 (2d Cir.2000); *Fant v. Perelman,* 97 Civ. 8435(LAP), 1999 WL 199078 at *5 (S.D.N.Y. April 9, 1999).

The Supreme Court held, in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), that the limitations period for civil claims under Section 10(b) of the Securities Exchange Act of 1934 is found in Section 9(e) of the Exchange Act, 15 U.S.C. § 78i(e). This Section provides that:

> No action shall be maintained to enforce any liability ... unless brought within one year after the discovery of the facts consti-

tuting the violation and within three years of such violation.

The *Lampf* limitations period requires plaintiffs to satisfy two separate conditions: the "within one year of discovery" prong and the "within three years of the violation" prong. Failure to satisfy either condition will result in dismissal.

Section 20 claims are also governed by the same statute of limitations because the section "only creates derivative liability for violations of other sections of the Act." *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 349 n. 2 (2d Cir.1993); *Barnes v. Printron, Inc.*, No. 93-Civ-5085 (JFK), 1998 WL 778378 (S.D.N.Y. Nov. 5, 1998).

This Circuit has held that the phrase "discovery of the facts constituting a violation" includes "inquiry notice" as well as actual notice. *Menowitz v. Brown*, 991 F.2d 36 (2d Cir.1993). Discovery occurs when "the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Id.* at 41–42.

### Statute of Limitations

Defendants argue that the allegedly fraudulent accounting for most of the twelve transactions at issue took place more than three years before plaintiffs brought suit. In addition, they argue that plaintiffs had inquiry notice of all the facts upon which his claims are based well more than one year before the complaint was filed. The record clearly indicates that all but one of plaintiffs' contentions, including all of the challenged accounting practices and two of the three additional frauds, are time-barred under at least one prong of the *Lampf* statute of limitations, and most are time-barred under both prongs.

### The Challenged Accounting Practices are All Time–Barred

#### 1. *DCI's January 1995 Acquisition of Alpha Products*

Defendants note that DCI had disclosed the facts of the Alpha Products accounting irregularity over six years before plaintiffs commenced this action. In is Form 8–K/A, filed in February, 1995, DCI described the

acquisition of Alpha and identified one of the assets purchased as: "Customer Base (Alpha's cost) 546,877." (Horowitz Decl., Exh. A, p. 3.) Further, in its Form 10–KSB for fiscal year ending March 31, 1995, filed in July, 1995, DCI disclosed that Defendant Murphy was the President and CEO of DCI, but that he also had been the President and CEO of Alpha, and that Defendant Shatsoff was the Vice–President and COO of DCI, but that he also had been the Vice–President and COO of Alpha. (Horowitz Decl., Exh. B., pg. 11.) In that same 10–K, DCI disclosed that the Alpha acquisition was "accounted for using the purchase method of accounting." (*Id.* at p. F–6.)

#### 2. *DCI's February 1995 Acquisition of Casino Marketing*

DCI disclosed the facts regarding the Casino Marketing accounting over six years before plaintiffs commenced this action. In its Form 8–K filed on or about March 3, 1995, DCI described the escrow arrangement in connection with the Casino Marketing acquisition as follows:

> On March 1, 1995, DCI ... acquired Casino marketing ... The purchase price is 2.5 million shares of 144 stock which are held in escrow by DCI ... and paid to Casino ... on a quarterly basis based upon the following formula: for every dollar of earnings before interest and taxes generated by Casino Marketing, Inc., one share of stock will be delivered out of escrow.

(Horowitz Decl., Exh. C, p. 2.) In its 1995 10–K, filed on July 5, 1995, DCI disclosed that "[s]uch shares remain in escrow." (Horowitz Decl., Ex. B, F–6.)

In its Form 10–KSB for fiscal year ending March 31, 1996, which was filed in July 1996, DCI disclosed that it had written off the Casino Marketing acquisition before the end of 1995:

> At the annual meeting of shareholders on July 26, 1995, the shareholders approved a quasi reorganization .... As part of the reorganization, the Company wrote off $1,624,500 of the net remaining investment in trademarks associated with Casino Marketing. Since the transaction was not con-

summated, all of the 162,500 shares of stock issued for the trademarks, which had been held in escrow, were returned to the Company and are held in treasury. Amortization recorded in the first two quarters totaling $117,000 was also reversed. In addition, the Company also reduced its inventory valuation by $63,182. The resulting accumulated deficit at December 31, 1995, the effective date of the reorganization, was charged to paid in capital. Retained earnings (deficit) starting date is January 1, 1996.

(Horowitz Decl., Ex. D, p. F–7.) Thus, Casino Marketing's assets were not included in DCI's financial statements for at least five years before plaintiffs commenced this action.

### 3. Deferred Compensation Paid to Certain DCI Employees in the Form of Stock

DCI disclosed the facts regarding the accounting of these employee stock options almost six years before plaintiffs brought this action. In its 1995 10–K, filed in July, 1995, DCI described the deferred compensation as follows:

> Certain officers of the company received stock options as part of the compensation agreements entered into in 1995. Options were exercised in the year ending March 31, 1995. The value of the options, based upon quoted market prices of the Company's stock, is being amortized over six years, the term of the employment agreements.

(Horowitz Decl., Ex. B, p. F–8.)

DCI wrote off the asset within a year, or almost five years before plaintiffs brought this action. In its 1996 10–K, filed in July, 1996, DCI made the following disclosure regarding the deferred compensation:

> Certain officers of the Company received stock options as part of compensation agreements entered into in 1995. The options were exercised in 1995 and the value of the options, based upon quoted market prices of the Company's stock was being amortized over six years, the term of the employment agreements.
>
> Subsequent to March 31, 1996, the Company agreed to cancel the options and shares

with respect to such employment agreements. This transaction, which has the impact of reducing deferred compensation and paid in capital, by $759,550 and $781,237, respectively, was recorded as if the event took place as of March 31, 1996. The shares, which are to be cancelled, are shown as treasury stock as of March 31, 1996.

(Horowitz Decl., Ex. D, p. F–8).

### 4. Contract with R & D Scientific Corp.

DCI disclosed the facts relating to the R & D Scientific Corp. acquisition almost five years before plaintiffs brought this action. DCI's 1996 10–K, filed in July 1996, included DCI's outside auditor's opinion, which provided as follows:

> As discussed in notes 2, 3 and 12, the Company has not completed the purchase and sale agreement with the R & D Scientific Corporation and is arranging long term financing for future operations. Although management believes the acquisition of R & D Scientific Corporation and the long term financing will occur, no assurance can be given that these events will occur. The financial statements do not include any adjustments that might result from the outcome of these uncertainties.

(Horowitz Decl., Ex. D, p. F–1.) In Note 2, DCI disclosed its accounting treatment of the R & D transaction:

> On June 19, 1995, DCI ... entered into a stock purchase and sales agreement with R & D ..., whereby DCI will acquire 100% of the outstanding common stock of R & D in a stock for stock purchase, with DCI exchanging 1.7 million shares of the common stock for 100 shares of R & D capital stock.

It further noted:

> The shares are to be exchanged based upon a $150,000 cash infusion by DCI to R & D. Such shares are in escrow but are included in outstanding common stock as of March 31, 1996 for financial statement purposes. Summarized financial data of R & D Scientific included in the financial statements since June 19, 1995, date of

purchase and sale agreement, is [set forth in this 10K].

DCI restated its 1997 financial statements to exclude the R & D transaction over three years before plaintiffs commenced this action. In its Form 10–QSB for the quarter ending December 31, 1997, which was filed on or about February 18, 1998, DCI stated:

The Company had included R & D operations as part of the consolidated group since June 19, 1995 as if the acquisition had been completed under the purchase method of accounting. In the quarter ending December 31, 1997, the parties mutually agreed to terminate the agreement, with R & D reverting back to its original owners. As a result, no operations of R & D are included in the financial statements, and all prior periods have been restated to exclude the operations of R & D.

(Horowitz Decl., Ex. E, p. 7.) Furthermore, DCI filed a Form 10–K/A in May, 1998, restating its audited financial statements for fiscal years 1996 and 1997, specifically to exclude the R & D transaction. (Horowitz Decl., Ex. F.)

5. *DCI's Agreement, in November 1996, to Acquire the Outstanding Stock of Muller Media, Inc.*

DCI disclosed facts relating to the acquisition of Muller Media over four years before plaintiffs brought this suit. In its Form 8–K that was filed in January, 1997, DCI described the Muller Media transaction as follows:

On November 26, 1996, DCI entered into a stock purchase agreement with Muller Media, Inc. (Muller) ... whereby DCI acquired 100% of the outstanding common stock of Muller in a stock for stock purchase, with DCI exchanging one million two hundred thousand (1,200,000) shares of common stock for all of the shares of Muller Media capital stock. The DCI stock was valued at two dollars and fifty cents ($2.50) per share.

The shares of both companies have been deposited with an escrow agent. DCI can repurchase the shares, if Muller exercises a "put" option which commences on the earlier of 120 days from December 27,

1996, unless an extension is requested by DCI, which Muller Media cannot unreasonably withhold, or 14 days after DCI has received an aggregate of $3 million in net proceeds from the sale of its capital stock. The selling shareholders have an option to keep DCI stock or accept up to $3 million in cash from DCI.

(Horowitz Decl., Ex. G., pg. 2.) In its Form 10–K, filed on June 25, 1997, DCI disclosed that the "shares of Muller Media had been deposited with an escrow agent but are included in the common stock for the year ending March 31, 1997." (Horowitz Decl., Ex. H, p. 3.) In February 1999, over two years before this action was commenced, DCI restated its 1997 and 1998 financial statements to adjust the acquisition date of Muller Media to June 9, 1998:

The previously issued financial statements included the results of operations of Muller Media, Inc., as of November 26, 1996, the date of the stock purchase agreement, under the purchase method of accounting. The accompanying financial statements exclude the results of operations of Muller Media, Inc. based upon comments and questions by the Securities Exchange Commission with respect to the timing of the acquisitions of Muller. The company will record the purchase of Muller on June 9, 1998, the date the final payment was made under the put option agreement.

(Horowitz Decl., Ex. I, p. 3).

6. *DCI's Acquisition, on March, 25, 1999, of all of the Stock of Travel Source*

DCI disclosed the facts regarding the Travel Source acquisition over four years before plaintiffs commenced this action. DCI revealed the alleged "contingency of additional consideration" in its Form 8–K that was filed in April, 1997, which described the Travel Source transaction:

On March 25, 1997 the Company entered a purchase and sales agreement to acquire 100% of the outstanding stock of Travel Source Limited, a Rhode Island corporation engaged in the travel agency business. DCI exchanged 29,412 shares of its common stock valued at $3.40 per share for 100% of Travel Source shares. If six

months from the closing, DCI shares are selling for less that $3.40 per share, DCI will give selling shareholders additional shares of 144 stock to bring the total purchase back to $100,000.

No financial statements are being filed because the acquisition is not significant.

(Horowitz Decl., Ex. J, p. 2.) Furthermore, in June 1997, DCI filed its Form 10–K for the year ending March 31, 1997, disclosing that it had accounted for the Travel Source acquisition as a "pooling of interests." (Horowitz Decl., Ex. H, p. 29.)

DCI restated its 1997 and 1998 financial statements more than two years before plaintiffs commenced this action to account for its acquisition of Travel Source as a purchase rather than a pooling of interests. In its Form 10–KSB/A, filed in February, 1999, DCI described the restatement with respect to Travel Source as follows, "On March 25, 1997, the Company acquired the Travel Source LTD. .... The Company incorrectly accounted for the acquisition using the pooling of interest method." (Horowitz Decl., Ex. I, p. 4.)

### 7. *DCI's Acquisition of Card Call International Holdings*

DCI disclosed facts relating to Card Call over three and one half years before plaintiffs commenced this action. DCI announced the details of the CardCall acquisition in its Form 10–QSBA, which was filed in August, 1997, and in its Form 8–K that was filed in September, 1997. DCI revealed that Card-Call's shareholders did not approve the transaction until June 1997:

On March 31, 1997, DCI, made an offer to CardCall International Holdings, Inc. (CardCall), a Delaware corporation, to purchase all its outstanding common stock .... In June 1997, the Board of Directors and shareholders of CardCall approved the transaction....

(Horowitz Decl., Ex. L, p. 2.)

As in the case of Muller Media and Travel Source, DCI restated its 1997 and 1998 financial statements over two years before plaintiffs brought suit to adjust the acquisition date of CardCall to May 29, 1997, more than two years before plaintiffs began this action. In its Form 10–KSB/A, filed in February, 1999, described its restatement with respect to its CardCall acquisition as follows:

The previously issued financial statements included the results of operations of Card-Call International, Inc. as if the acquisition had been completed as of April 1, 1997, under the purchase method of accounting. The accompanying financial statements include the results of operations of CardCall International, Inc. since May 29, 1997 under the purchase method of accounting based upon comments and questions by the Securities and Exchange Commission with respect to the timing of the acquisition of CardCall.

(Horowitz Decl., Ex. I, p. 4.)

### 8. *DCI's Acquisition, in April, 1999, of Edge Communications, Inc.*

DCI disclosed facts relating to Edge almost three years before plaintiffs began this action. DCI reported the two year voting proxy in its Form 8–K that was filed in May, 1998, which generally describes the Edge transaction and then attaches a copy of the Stock Purchase Agreement, which provides as follows:

Each share of the Purchase Shares held by Seller, and any successor in interest to the Purchase Shares, will vote the Purchase Shares in the same manner as recommended by the current President of Buyer [Defendant Murphy] for a period of 2 years from the date of closing. To effectuate said restriction, each Seller shall execute and deliver to Buyer the Irrevocable Proxy attached hereto as Schedule B.

(Horowitz Decl., Ex. M., p. 5.) Furthermore, in August, 1998, DCI filed its Form 10–QSB for the quarter ending June 30, 1998, disclosing that it had accounted for the Edge acquisition as a "pooling of interests." (Horowitz Decl., Ex. N, pg. 9.)

DCI restated its 1997 and 1998 financial statements to adjust the accounting treatment for the Edge acquisition. In May, 1999, almost two years before plaintiffs commenced this action, DCI filed its Form 10–QSB/A, which restated its audited financial statements for the quarter ending June 30, 1998, and described the change in the accounting treatment of Edge as follows:

[A]s a result of inquiries from the Securities and Exchange Commission, this form 10QSB/A has been restated ... to account for the acquisition of Edge Communications on April 20, 1998 using the purchase method of accounting rather than the pooling of interest method....

(Horowitz Decl., Ex. O, p. 8.)

### 9. DCI's Contract with IXC Communications, Inc.

DCI disclosed in its Form 10–QSB for the quarter ending September 30, 1999, which was filed in November, 1999, that "[a]s of September 30, 1999, the Company believes it has not received rates which are competitive, has not received the switching equipment, and has suspended all business with IXC" and that, "[a]s a result the Company has written off the remaining unamortized investment totaling $13,321.093." (Horowitz Decl., Ex. P, p. 8–9.) Thus, the IXC asset was completely written off nineteen months before plaintiffs commenced this action.

### 10. DCI's Sale of a Subsidiary to Carlyle Corporation

DCI disclosed that Carlyle assigned its contractual rights and obligations under its contract with DCI to a third party who paid the promissory note with stock, to which DCI assigned no value. In its Form 10–QSB for quarter ending September 30, 1999, which was filed in November, 1999—almost one and a half years before plaintiffs began this action—DCI disclosed the following:

In June 1999, with the agreement of DCI and some modifications of the agreement, Carlyle assigned all its rights and obligations to SmartFax, Inc., a private Canadian corporation. At the closing, SmartFax paid off its promissory note by issuing 5,000,000 shares of its common stock to DCI. No value has been placed on the SmartFax shares and no revenue or profit has been recorded.

(Horowitz Decl., Ex. P, p. 9.)

### Two of the Other Alleged Frauds are Time–Barred

### 1. Sale of S–8 Stock to the Public

The sale of S–8 stock to the public, that plaintiffs allege perpetrated a fraud on the market, took place between February 1995 and February 1996, over five years before plaintiffs brought this transaction. (Compl.¶ 33.)

### 2. Defendant Murphy's Internet Chat Room Disclosures

Defendant Murphy's private internet chat room conversations on the website silicon-investor.com, that plaintiffs allege were attempts to deceive the market and DCI investors, took place in February and March of 1998, over three years before the date of plaintiffs' complaint. (Compl.¶¶ 42–43.)

## I. Violations that Occurred More Than Three Years Before the Action Commenced

Defendants argue that plaintiffs are barred from bringing any claim with respect to the first seven transactions because the alleged fraudulent accounting occurred over three years before plaintiffs commenced this action. Plaintiffs do not respond to this argument in their opposition to summary judgment.

■ Defendants are correct that the Alpha Products, Casino Marketing, Deferred Compensation, R & D Scientific, Muller Media, Travel Source, and Card Call transactions all occurred more than three years before plaintiffs brought this action, and hence, the claims relating to these transactions are time-barred under Section 9(e) of the Securities Exchange Act of 1934. Furthermore, the sale of S–8 stock to the public and Defendant Murphy's Internet chat room disclosures also occurred over three years before the plaintiff's complaint was filed and are time-barred for that same reason.

## II. Notice of the Facts Constituting the Violations

Defendants argue that plaintiffs were on inquiry notice of the facts underlying the alleged fraudulent accounting more than one year before they commenced this action.

Plaintiffs respond that: (A) the determination of whether the plaintiffs had inquiry notice is a factual determination; (B) that the continuing fraud doctrine prevents the tolling of the statute of limitations; (C) that the policy behind PSLRA should deter the court from dismissing their claims based on the statute of limitations; and (D) that the doctrine of equitable tolling should prohibit dismissal.

*A. Inquiry Notice of the Plaintiffs' Claims*

■ In order to show inquiry notice, the defendants must demonstrate circumstances that would suggest to a person of ordinary intelligence the probability that he or she had been defrauded. *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983); *Lenz v. Associated Inns and Restaurants,* 833 F.Supp. 362, 371 (S.D.N.Y.1993). The standard is an objective one. "A plaintiff in a federal securities case will be deemed to have discovered fraud for the purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993).

■ Plaintiffs argue that the determination of inquiry notice is a factual one, inappropriate at the motion to dismiss stage. The law in this circuit is clear, however, that a court can, as a matter of law, determine whether an investor of ordinary intelligence would be on inquiry notice in the circumstances described in the complaint. *Dodds,* 12 F.3d at 350. Because of the objective standard, "a court's determination that the information available to a plaintiffs in a given instance should (or should not) have given him reason to consider and investigate the probability of fraud is surely warranted in appropriate cases." *Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993); *see also In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620, 637–38 (S.D.N.Y.1993) ("objective test mandates dismissal of or summary judgment on a plaintiff's securities fraud claim when the 'pleadings disclose facts sufficient to have placed the plaintiff on inquiry notice of the alleged fraud prior to the one-year cut-off.' ") (quot-

ing *Bresson v. Thomson McKinnon Sec., Inc.,* 641 F.Supp. 338, 345 (S.D.N.Y.1986)); *Intre Sport Ltd. v. Kidder, Peabody & Co.,* 625 F.Supp. 1303, 1310 (S.D.N.Y.1985) (stating that "where it is clear that the defendants cannot, as a matter of law, refute the defendant's plea of limitations, summary judgment may be granted").

The cases plaintiffs cite are distinguishable from the case at hand. In *Rothman v. Gregor,* 220 F.3d 81 (2d Cir.2000), an issue of fact remained for a jury because the critical document that arguably provided notice was not publicly available. Similarly, in *Vassilatos v. Ceram Tech Int'l Ltd.,* No. 92 Civ 4574, 1993 WL 177780, at *1 (S.D.N.Y. May 19, 1993), defendant did not rely on statements made in public disclosures as the basis for notice but, rather, argued that individual personal statements made directly to plaintiffs during private placements of stock in a nonpublic company provided notice. *Vassilatos,* at *4. In contrast, all of the disclosures upon which the defendants in this case rely are contained in public records that were filed on easily verifiable dates more than one year prior to the commencement of this action.

■ In order to demonstrate inquiry notice, the defendant must establish that the plaintiffs acquired information that suggested the probability that fraud had occurred, not merely the possibility. *Lenz v. Associated Inns and Restaurants Co. of America,* 833 F.Supp. 362, 371 (S.D.N.Y.1993); *In re Integrated Resources Real Estate Litigation,* 815 F.Supp. 620, 638 (S.D.N.Y.1993). Once "storm warnings" appear, plaintiffs must exhibit "reasonable diligence" in investigating the possibility that they have been defrauded. *Rothman v. Gregor,* 220 F.3d 81, 97 (2d Cir.2000); *Dodds,* 12 F.3d at 350; *Lenz,* 833 F.Supp. at 370. "An investor [is] not [required] to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds,* 12 F.3d at 352; *Arneil,* 550 F.2d at 780. Rather, plaintiffs have a duty to inquire into the reliability of a defendant's representations where there is information that suggests that there are any material misrepresentations. *Addeo v. Braver,* 956 F.Supp. 443, 450 (S.D.N.Y.1997). Facts giving rise to

inquiry notice may come from a number of sources, such as:

> any financial, legal or other data available to the plaintiffs providing them with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities].

*In re Integrated Resources Real Estate Securities Litigation,* 815 F.Supp. at 639.

■ In this case, plaintiffs had sufficient storm warnings to be placed on inquiry notice of all of the challenged actions, with the exception of the Corzon claims, more than a year before the complaint was filed. In May 1998 and February 1999, DCI revised the accounting treatment for nearly all of its acquisitions. In May 1998, DCI filed an amended Form 10–KSB containing restated audited financial statements for the years ended March 31, 1996 and 1997, which had omitted results from the R & D Scientific transaction due to the reversal of that transaction. This was only the first in a string of disclosures alerting DCI investors to the problems with DCI's accounting for acquisitions. The initial restatement was followed on February 3, 1999, by an SEC filing restating audited financial statements for the years ended March 31, 1997 and 1998, which were contained in an amended Form 10–KSB. The restatement revised the accounting treatment of three more DCI acquisitions: Muller Media, Travel Source and Card Call. Thus, by early February 1999, virtually every DCI acquisition had undergone a significant accounting treatment revision.

On May 3, 1999, the SEC gave plaintiffs the biggest indication that something was amiss by ordering a ten day suspension in trading of the DCI stock. The accompanying SEC release pointed to the SEC's suspicions regarding accounting irregularities involving acquisitions. The SEC said that the suspension had been ordered because of:

> questions regarding the accuracy and adequacy of DCI's financial statements, specifically DCI's apparent inflation of revenues by accounting for one or more business combinations as a 'pooling of interest.'

(Compl., ¶ 71.) DCI's press release reiterated this statement by the SEC, noting that the accounting for Edge Communications was about to be revised, and confirming that the February 3, 1999 restatement had been made at the request of the SEC. (HD, Exh. R; Compl., ¶¶ 72–73.)

The market took notice of this SEC trading suspension. In the months after the suspension, DCI stock lost 76 percent of its value. On May 2, 1999, the stock closed at 2⅛. By the end of June 1999, DCI stock was worth 1⅛. On July 30, it closed at 1. By September 30, the stock had fallen to 1/2. During this period, DCI also filed its Form 10–KSB for the year ended March 31, 1999. DCI again disclosed the SEC's ongoing investigation in the wake of the trading suspension. On August 6, 1999, DCI revealed that its application for a SmallCap listing had been denied by Nasdaq more than two years earlier. (Compl., ¶ 83.) Plaintiffs themselves call this a "highly material, adverse fact." *Id.*

These facts constitute storm warnings that should have alerted plaintiffs to the probability that there were either misleading statements or significant omissions made by DCI. The May 1998 and February 1999 restatements of audited DCI financial statements, the SEC trading suspension, the SEC statement about accounting irregularities at DCI, the disclosure of the SEC investigation, the rapid decline in DCI's stock price, and the belated disclosure of Nasdaq's rejection of DCI for a SmallCap listing all would give an ordinarily intelligent investor sufficient notice to be under a duty to inquire, certainly no later than by the end of September 1999, into whether he or she had been defrauded.

The fact situation in this case is quite close to that in *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402 (2d Cir.1975), where the Second Circuit found that plaintiffs had been placed on inquiry notice of a fraud by virtue of trading suspensions in the subject company's stock, a nearly 70 percent drop in the stock price over a five-month period, and lawsuits by the SEC and private parties. Since plaintiffs had failed to sue within the statutorily-prescribed period following these occurrences, the Second Circuit dismissed

the securities fraud claims as time-barred.[2] *See also Tregenza v. Great American Communications Co.,* 12 F.3d 717, 720 (7th Cir. 1993) (where stock described to plaintiffs as "undervalued" and likely to double instead lost 90 percent of its value, reasonable investor would have become suspicious; plaintiffs failed to sue within a year after such inquiry notice and claims were thus time-barred).

■ Plaintiffs argue that inquiry notice was not triggered until July 23, 2000, when the SEC filed an action against the defendants. In *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402 (2d Cir.1975), pending SEC lawsuits were additional storm warnings. But, SEC lawsuits are by no means a necessary trigger for inquiry notice. Numerous cases in this Circuit have found inquiry notice in the absence of an SEC lawsuit. *See e.g., Dodds v. Cigna Securities, Inc.,* 12 F.3d 346 (finding inquiry notice where prospectuses that disclosed that investments were risky and illiquid); *Barnes v. Printron, Inc.,* No. 93–Civ–5085 (JFK), 1998 WL 778378 (S.D.N.Y. Nov. 5, 1998) (holding that defendants established inquiry notice where company restated its financial statements, and plaintiffs believed that they had been mislead); *Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1412 (S.D.N.Y.1996) (finding inquiry notice due to SEC filings and press releases more than one year before suit filed); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620, 661 (S.D.N.Y.1993) (finding that investors were placed on inquiry notice by virtue of press reports surrounding entity's financial difficulties and subsequent demise, and by communications from the entity).

Plaintiffs also cite cases in which negative information in public filings alone was insufficient to establish inquiry notice. For example, in *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,* 840 F.Supp. 243, 253 (S.D.N.Y.1993), the court did not find inquiry notice where the filings involved only a forecast that later proved incorrect, which the court found "is not to be accorded the same weight as a discrepancy between statements

concerning past or existing facts for purposes of determining whether a plaintiff was on inquiry notice of a predicate act of misrepresentation." *Id.* The court in *In re Executive Telecard, Ltd. Securities Litig.,* 913 F.Supp. 280 (S.D.N.Y.1996) held that the accounting disclosures in defendant's 10–K were insufficient to provide notice as a matter of law. However, this case does not involve forecasts that failed to pan out. Here there have been restatements of financials, revaluations, multiple write-offs, an SEC trading suspension, and a huge drop in the stock price.

■ Plaintiffs also contend that the drop in DCI's stock price alone cannot serve as a "storm warning." Plaintiffs are correct that a drop in stock price alone is insufficient. Otherwise, every stock owner in a bear market would be put on notice of fraud. But, again, the drop in stock price was not the only storm warning DCI investors had.

In essence, plaintiffs argue that none of the storm warnings, taken alone, were sufficient to provide inquiry notice. The issue, however, is whether the objective facts and circumstances, *taken as a whole,* provided inquiry notice. In this case, the undisputed facts show inquiry notice and a lack of reasonable diligence on plaintiffs' part in discovering the fraud.

Plaintiffs argue that even if DCI's disclosures could otherwise support a finding that they were on inquiry notice, the disclosures were "tempered with positive statements" that confused and mislead investors "by downplaying the significance of DCI's accounting improprieties." (Opp. Brief at 10–12.) As such, even if plaintiffs had exercised reasonable diligence in inquiring into DCI's practice, they would not have been able to see through DCI's scheme. Plaintiffs cite various press releases in support of their argument.

DCI issued a January 1999 press statement noting that performance was "stronger than expected." (Compl.¶ 61.) In February of that year, DCI indicated that "these are

---

**2.** *Berry* is a pre-*Lampf* case decided under an analogous state law statute of limitations which was held to be applicable under the analysis

commonly used prior to *Lampf's* establishment of a uniform limitations period for Section 10(b) claims.

exciting times at DCI, especially as our growth plan begins to unfold." (Compl.¶ 63.)

On May 7, 1999, DCI responded to the SEC's decision to halt the trading of its shares. The release stated that:

> While we are very concerned over the action taken by the SEC, we will be restating certain financial information for the first three quarters of the fiscal year ended March 31, 1999 to reflect the purchase method of accounting for Edge .... This accounting change will have no bearing on the company's current or future business activities.

(Compl.¶ 73.) The release also contained a quote from Debra Jeter, an Assistant Professor of Management at Vanderbilt University, stating:

> Even though a change is being made, no cash difference exists between the two methods. If the market is perfect efficiently, it should be able to see right through it, and it shouldn't make any difference.

(Compl.¶ 74.) Defendant Murphy also stated in this release that "the company by any financial standard has grown phenomenally over the past three years." (Compl.¶ 76.) On June 29, 1999, the company issued a press release announcing a record breaking year, and stating that "current and prior-year audited results have been restated in accordance with generally accepted accounting principles." (Compl.¶ 77.)

█ Plaintiffs claim that they were assuaged by DCI press releases issued from January through August 1999. (Compl.¶¶ 61–63, 67, 69–70, 72–77.) These releases, however, do not rise to the level of fraudulent concealment which would allow plaintiffs to evade the statute of limitations. The press release dated May 7, 1999, which states that the "accounting change will have no bearing on the company's current or future business activities" does not relate to the propriety of the accounting methodology used in the first place. Similarly, the headline of DCI's press release dated June 29, 1999 that "DCI ... Announces Record Breaking Year" also does not relate to the propriety of any of the accounting methodologies. Furthermore, the drop in DCI's stock price following the SEC's suspension of trading confirms that DCI's statements should have been viewed with some skepticism.

Most of the releases quoted by plaintiffs, especially those that were issued in the wake of the SEC-imposed trading suspension, contained good news tempered by bad. Plaintiffs place particular emphasis on the release of May 7, 1999, which dealt with the suspension order. Plaintiffs describe that release as designed "to confuse and mislead investors by downplaying the significance of the DCI's accounting improprieties related to DCI's accounting for acquisitions." (Compl., ¶ 74.) However, the second paragraph of the release quotes directly from the SEC statement regarding the apparent inflation of DCI's revenues arising from that accounting treatment.

Furthermore, Professor Jeter's statement that the accounting change from pooling to purchase makes no cash difference and that an efficient market "should be able to see right through" the revision was not misleading. Rather, given the events that followed, it should have triggered plaintiffs' concern. Contrary to Professor Jeter's prediction, the market did not ignore this revision. Instead, DCI's stock faltered, losing 22 percent of its value the day after trading resumed. The stock continued to decline throughout the summer of 1999. Hence, even if the May 7 press release was designed to put forth the news that everything was just fine, the market's reaction to the release should have alerted DCI investors to the contrary.

An investor who believed that the accounting revisions questioned by the SEC would have no impact on the company's stock prices was under a duty to inquire into the veracity of those assurances in light of the many disclosures in DCI's SEC filings, and the subsequent precipitous drop in DCI's stock price. Courts in this Circuit have held that evidence that an investment asset has declined in value in direct contradiction of a representation made to the plaintiffs at the time of sale constitutes inquiry notice as to the probability of fraud. *Lenz v. Associated Inns and Restaurants Co. of America*, 833 F.Supp. 362, 373–76 (S.D.N.Y.1993) (citing

*Zola v. Gordon,* 685 F.Supp. 354 (S.D.N.Y. 1988) (finding that plaintiffs were on inquiry notice of fraud upon receipt of an IRS letter valuing assets of a limited partnership at an amount significantly less than defendant had represented at sale); *Hupp v. Gray,* 500 F.2d 993 (7th Cir.1974) (finding inquiry notice where stock price fell during the period in which the broker had promised it would increase)). Even if investors were lulled into inaction by press releases, the SEC's suspension and the market's response following it should have roused them. *Salinger v. Projectavision,* 934 F.Supp. 1402, 1408–11 (S.D.N.Y.1996) (finding that a reasonable investor would have inquired into press releases regarding a company's readiness to manufacture electronics when the company's SEC filings announced that the company was experiencing difficulties and was still researching the product).

Plaintiffs cite *In re Complete Management Inc. Securities Litigation,* 153 F.Supp.2d 314 (S.D.N.Y.2001) and *In re Ames Department Stores, Inc. Note Litigation,* 991 F.2d 968 (2d Cir.1993) for the proposition that there is no inquiry notice when defendants make reassuring statements. "[C]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements." *Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 229 (S.D.N.Y.1999) (citing *In re Ames Dep't Stores, Inc. Note Litig.,* 991 F.2d 968 (2d Cir.1993)). In those cases, however, the storm warnings themselves were tempered with positive statements. For example, in *In re Complete Management Inc. Securities Litigation,* the statements that defendants alleged were storm warnings were in and of themselves reassuring to the plaintiff. In the case at hand, DCI's press release did not comment on the propriety of the accounting nor defended the accounting methodologies. Instead, the press statements focused on DCI's overall future. Furthermore, the additional storm warnings of the SEC's suspension of trading and the dramatic drop in stock price also weigh against plaintiff's argument. Publicly-available information questioning of the reliability of DCI's financial statements and the possible inflation of its revenues stemming from its accounting practices, in conjunction with the publicly-filed (and then restated) audit opinions, was sufficient to alert a reasonable investor of the need to investigate a potential claim against DCI and its auditors.

This Circuit has recently reiterated that a plaintiff's claim is time-barred when "after obtaining inquiry notice, [plaintiffs] in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud...." *Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir.2000). In this case, in contrast to the situation in *Rothman,* where the plaintiff alleged that the information that they needed to plead fraud was contained in "costly" and "not readily accessible" documents, plaintiffs do not assert that they inquired into the fraud during the time that they were charged with inquiry notice, but were unable to discover the facts underlying the alleged fraud. As such, there is no factual dispute regarding whether the information was publicly-available to plaintiffs and this Court finds that they were under constructive notice of all the facts in their complaint (with the exception of those relating to the Corzon allegations) as of November 1999.

Plaintiffs' own pleadings make it clear that as of at least the fall of 1999, plaintiffs knew, or should have known, that there was the possibility of fraud. In light of the numerous accounting restatements, the SEC trading suspension, the press releases that followed it, and the decline in stock prices, this court holds that plaintiffs with reasonable diligence should have discovered the alleged fraud.

### B. Continuing Fraud Doctrine

Plaintiffs contend that the last alleged fraudulent act, DCI's failure to distribute Corzon shares, which it had promised it would distribute as part of a dividend in a press release on November 27, 2000, is part of a continuing fraudulent scheme. Therefore, plaintiffs claim that the statute of limitations should not run until that last act of the scheme has been committed, his claims based on the older transactions are timely.

It is not at all clear that the continuing fraud doctrine applies in securities fraud cases. *SEC v. Caserta,* 75 F.Supp.2d 79, 89

(E.D.N.Y.1999) (citing *SEC v. Schiffer*, 97–CV–5835, 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998)). Plaintiffs cite a RICO case from this circuit, *Bingham v. Zolt*, 66 F.3d 553, 560–61 (2d Cir.1995), in support of its position. I am not persuaded that the running of the statute of limitations is identical in the securities context.

 However, even if I were to acknowledge the continuing fraud doctrine in this context, the alleged misrepresentations concerning the Corzon shares (the only timely allegation under *Lampf*) have no relationship to the alleged accounting improprieties that occurred years earlier. *See SEC v. Caserta*, 75 F.Supp.2d at 89 (holding that the continuing fraud doctrine only "applies when a violation occurring outside the limitation period is so closely related to other violations which are not time-barred as to be viewed as part of a continuing practice for which recovery should be had for all violations"). Plaintiffs' complaint alleges that DCI has been selling Corzon shares it had promised investors as part of a dividend, and that DCI has no intention of ever distributing those shares to its shareholders. Plaintiffs do not allege that this is related to any earlier accounting impropriety, and it bears no necessary nexus to the earlier alleged falsifications. As a matter of law, this does not qualify as a continuing fraud.

## C. PSLRA Policy

Plaintiffs contend that it should not be held to the statute of limitations because to do so would conflict with the PSLRA's policy of discouraging frivolous litigation. This court is fully aware that in cases arising under PSLRA, plaintiffs should not be encouraged to file potentially frivolous lawsuits before they have an opportunity to discover the basic facts. *Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir.2000) (citing *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1202 (10th Cir.1998) ("the applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims.")). However, the question of when claims against the defendants become time-barred turns on when, in the exercise of reasonable diligence, plaintiffs should have discovered the facts underlying the alleged fraud by the defendants. *Rothman*, 220 F.3d at 97.

At the point when a plaintiff could and should have discovered a fraud, a securities fraud suit would hardly be groundless. The one year / three year statute of limitations was clearly articulated in 1991 in *Lampf.* Congress did not modify the statute of limitations when it passed the PSLRA in 1995. While the PSLRA is intended to prevent frivolous litigation, plaintiffs must satisfy both the heightened pleading requirements and the statute of limitations.

If plaintiffs had proceeded to investigate the allegedly questionable acquisition accounting that was referred to in the May 3, 1999 SEC release, and that was the subject of the restated DCI financial statements filed with the SEC, he could have timely filed a complaint.

## D. Equitable Tolling Doctrine

Plaintiffs argue that equity mandates that the running of the statute of limitations must be tolled until, objectively speaking, plaintiffs, with reasonable diligence, should have discovered critical facts of both the injury and its cause. *Corcoran*, 202 F.3d 530, 544–45 (2d Cir.1999). Under the doctrine of equitable tolling, "if the defendant actively prevented plaintiff from discovering the basis of the claim, then the statute of limitations will be tolled for the period of concealment." *Dodds*, 12 F.3d at 352.

 The doctrine of equitable tolling does not apply to the statute of limitations in securities fraud cases. *See Lampf v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) ("the 1–year period, by its terms, begins after discovery of the facts constituting the violation, making [equitable] tolling unnecessary"; "[because] the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that [equitable] tolling principles do not apply to that period"); *Rothman v. Gregor*, 220 F.3d 81, 97 n. 1 (2d Cir.2000). Thus, plaintiffs' argument is merely a restatement of the lack of inquiry notice

claim. *Dafofin Holdings S.A. v. Hotelworks.com, Inc.*, 2001 WL 940632 (S.D.N.Y. 2001) (citing *Cohen v. Prudential–Bache Sec.*, 777 F.Supp. 276, 279 (S.D.N.Y.1991) ("[w]hereas equitable tolling generally applies in fraud cases, the doctrine does not apply to claims for securities fraud under section 10(b)")).

Thus, all of the plaintiffs' claims except for the Corzon allegations are time-barred.

## III. Leave to amend

■ Plaintiffs ask for leave to amend if the court determines that his complaint is deficient. In general, "leave to amend should be freely granted," and "there must be good reason to deny the motion." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir.1995). Because this Court holds that plaintiffs' claims (except the Corzon allegations) are barred by the statute of limitations, any attempt to amend would be futile. Since futility is a "good reason" to deny leave to amend, *Chill v. General Electric Co.*, 101 F.3d 263, 271 (2d Cir.1996); *Acito*, 47 F.3d at 55, this Court denies plaintiffs' request.

All allegations except those relating to Corzon are time-barred. In their opposition to class certification, the accountant defendants point out that plaintiffs did not make any specific allegations of accounting fraud in relation to the Corzon claims. Furthermore, plaintiffs' amended complaint pleads that S & K resigned as DCI's independent auditor in July 1999 after finishing the 1999 audit, well over a year before the Corzon dividend was announced. (Compl.¶ 11.) The Corzon allegations in the complaint make no reference to S & K or to any financial statements that they prepared. The accountant defendants are therefore dismissed from this action. All allegations except those relating to Corzon are dismissed as to the DCI defendants.

## IV. Scienter

Defendants' argument that plaintiffs failed to plead scienter adequately is now moot with respect to all of the allegations except the Corzon allegations. The DCI Defendants' motion to dismiss for failure to plead the Corzon allegations adequately is denied.

■ To state a prima facie case of securities fraud, plaintiffs must allege (1) material representation or omission; (2) made with scienter; (3) upon which plaintiffs relied; and (4) which proximately caused plaintiffs' injuries. *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir.2001); *Acito*, 47 F.3d at 52; *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir.1994). Plaintiffs must also meet the requirements of Rule 9(b), which states that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Under Rule 9(b), however, "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). This somewhat more relaxed pleading requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990).

■ The Private Securities Litigation Reform Act, ("PSLRA"), requires that plaintiffs set forth each allegedly misleading statement and explain why it is misleading. To state a claim with the required particularity, a complaint "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the fraudulent statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 83 (2d Cir.1999) (quoting *Acito*, 47 F.3d at 51) (internal citation omitted). To plead scienter, plaintiffs must establish a "*strong inference of fraudulent intent.*" *Chill*, 101 F.3d at 267 (emphasis in original); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). The inference may be established either by (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Chill*, 101 F.3d at 267 (citing *Shields*, 25 F.3d at 1128).

■ Plaintiffs bear a significant burden in stating a fraud claim based on recklessness. Fraud cannot be inferred because defendant might have been more curious or should have been more alert and more skeptical, but there is no indication that manage-

ment was promoting a fraud. *See Chill,* 101 F.3d at 270; *Shields,* 25 F.3d at 1129. Plaintiffs must allege conduct which is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Secs. Litig.),* 220 F.3d 36, 39 (2d Cir.2000). Securities fraud claims are sufficient if they "specifically allege[ ] defendant's knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000).

 Plaintiffs argue that DCI filed material misrepresentations with the SEC, and that Defendants knew these statements were false and misleading or at least acted with recklessness in not knowing that these statements were falsely made. Plaintiffs allege that DCI never had any intention of distributing Corzon shares to its investors, and that it now cannot distribute these shares because it has already sold many of them for its own benefit. (Compl.¶¶ 87–93.) Plaintiffs' allegations that DCI told investors in November 2000 that it would be distributing Corzon shares in December 2000 when it had already sold these shares is sufficient to support an inference of fraudulent intent.

## V. DCI Defendants' Motion for Partial Summary Judgment

The DCI defendants also have moved for partial summary judgment with respect to the Corzon allegations pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. They argue that after the November 27, 2000 announcement of the dividend, DCI took all of the steps necessary to distribute the Corzon shares to its stockholders but was prevented from doing so by Corzon's transfer agent. According to Corzon's transfer agent, its SB2 Registration Statement covering the

shares had to be amended before the shares could be distributed. DCI acknowledges that in December 2000 it did begin selling Corzon shares for its own account, but asserts that it has set aside the shares needed to pay the dividend. DCI asserts that it will pay the dividend as soon as the Corzon (now called LecStar) transfer agent releases the shares for distribution.

Plaintiffs respond that they cannot properly respond to the DCI defendants motion for summary judgment because under the PSLRA discovery is prohibited while a motion to dismiss is pending. 15 U.S.C. § 78u–4(b)(3)(B). Plaintiffs ask the court to order a continuance under Rule 56(f) of the Federal Rules of Civil Procedure so that discovery may be conducted.

While defendants have put forth a strong case that summary judgment should be granted in their favor, it would be improper to decide this motion without allowing the plaintiffs to conduct any discovery.[3] Even though a motion for summary judgment can be made at any time, the Supreme Court has explained that summary judgment should only be granted "after adequate time for discovery...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Second Circuit also has "frequently emphasized the critical importance of discovery in the summary judgment context." *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2d Cir.1983). Summary judgment before discovery should be "granted only in the clearest of cases." *See Kleinman v. Vincent,* No. 90 CIV 5665, 1991 WL 2804, at *1 (S.D.N.Y. Jan.8, 1991); *Park Ave. Bank, N.A. v. Bankasi,* No. 93 CIV. 1483, 1995 WL 739514, *1 (S.D.N.Y. Dec. 13, 1995) ("Summary judgment is strongly disfavored prior to the parties having had an adequate opportunity for discovery").

Rule 56(f) provides that:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's

---

**3.** But for the PSLRA, there would have been no stay of discovery and I would be free to consider the DCI defendants' dispositive motion.

opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FRCP 56(f); *see also Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983). In *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985), the Second Circuit set out the requirements for claiming to be unable to produce evidence in opposition to the motion to file an affidavit. The affidavit must state:

1. the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and

2. how those facts are reasonably expected to create a genuine issue of material fact; and

3. what efforts the affiant has made to obtain those facts; and

4. why those efforts were unsuccessful.

*Id.* at 926. *See also Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994).

 This Court is satisfied that plaintiffs have met this burden. The Affidavit of Corey D. Holzer sets forth that plaintiffs have not been able to examine documents in the possession of the DCI defendants that they believe will show that DCI was selling Corzon shares at the same time that it was telling its stockholders that the Corzon shares could not be distributed to them, nor have plaintiffs been able to take deposition testimony from the DCI Defendants. Plaintiffs have not been able to obtain this discovery because of the PSLRA rule prohibiting discovery while a motion to dismiss is pending. 15 U.S.C. § 78u–4(b)(3)(B). Hence, plaintiffs' motion for further discovery is granted with respect to the Corzon allegations. All discovery on this issue is to be completed by June 29. Defendants may renew their motion for summary judgment by July 19.

## VI. Motion for Class Certification

Also before this Court is plaintiffs' motion for class certification. I will decide the class certification motion with respect to the Cor-

zon allegations only, since the motion for class certification is moot with respect to all of the other allegations. The accountant defendants' separate motion in opposition to class certification is also moot.

Plaintiffs Gramm, Bush, and de la Fuente seek to represent a class comprised of all persons who purchased and/or otherwise acquired DCI stock during the period from April 21, 1998 through April 20, 2001. Because all of the allegations have been dismissed except for the Corzon allegations, this proposed class period is too long. The class period should run from November 27, 2000 to December 6, 2000. This class period starts on the day that DCI declared that it would issue the stock dividend. On that date, DCI announced that persons who owned its stock as of December 6, 2000 would receive a one-time stock dividend. Plaintiffs argue that DCI never had any intention of distributing that stock dividend, and therefore that DCI's statements regarding the dividend were fraudulent. The investors that could have relied on the allegedly fraudulent announcements were those investors who owned or purchased stock from the time that the dividend was announced until the date that DCI stated it would use to determine who should receive the dividend (December 6, 2000). Anyone who bought DCI stock after December 6, 2000 would not have been entitled to the dividend, and hence, could not have relied on the allegedly fraudulent statements in making the decision to buy DCI stock.

Federal Rule of Civil Procedure 23 specifies the criteria for certification of a class action. The basic criteria are:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 132–33 (2d Cir.2001); *Shankroff v. Advest, Inc.,* 112 F.R.D. 190, 193 (S.D.N.Y.1986).

Additionally, one of the three elements of Rule 23(b) must also be satisfied. *Visa Check/MasterMoney*, 280 F.3d at 133; *Bresson v. Thomson McKinnon Securities*, 118 F.R.D. 339, 344–45 (S.D.N.Y.1988). Plaintiffs argue that this case falls within the category of Rule 23(b)(3), that common questions of law and fact predominate over questions affecting individuals and a class action is the superior methods for adjudicating the case. Fed.R.Civ.P. 23(b).

As noted above, plaintiffs allege that in spite of DCI's November 27, 2000 announcement of a one-time stock dividend, whereby one share of Corzon would be given to DCI shareholders for each share of DCI that they owned as of December 6, 2000, the company has never distributed those shares to its shareholders and has no intention of ever distributing the Corzon shares to its investors because it has been selling these shares for its own benefit. (Compl.¶¶ 87–93.)

*A. Numerosity*

■■■ The first requirement of Rule 23(a) is that the class be so numerous that joinder of all aggrieved individuals would be impracticable. Fed.R.Civ.P. 23(a)(1). Given the large numbers of outstanding DCI stock, it is reasonable to infer that the number of plaintiffs satisfies the requirement of numerosity. *Somerville*, 102 F.R.D. at 502–03; *see e.g., Bresson*, 118 F.R.D. at 342; *Shankroff*, 112 F.R.D. at 192. It is unnecessary to state the precise number of investors who are proposed class members, especially in securities litigation. *Somerville v. Major Exploration, Inc.*, 102 F.R.D. 500, 502–03 (S.D.N.Y.1984) (finding that because of the large number of outstanding shares, the potential class could be inferred to be in the thousands, hence the date of initial public offering to the date of the complaint was sufficient to meet the criterion of numerosity). Courts have held that as few as forty investors, who are widely scattered, are sufficient to satisfy this criterion. *Korn v. Franchard*, 456 F.2d 1206, 1209 (2d Cir.1972). Thus, plaintiffs in this case have satisfied the numerosity requirement.

*B. Commonality of questions of fact or law*

■■■ The second requirement of Rule 23(a) is that there exist questions of law or

fact common to the class. Fed.R.Civ.P. 23(a)(2). Plaintiffs also meet the commonality requirement. For common issues of fact to exist in the context of securities fraud, it is sufficient that similar material misrepresentations and/or omissions need to have been made to the members of the class—absolute uniformity is not required. *Bresson*, 118 F.R.D. at 343. Commonality of fact exists where the alleged misrepresentations relate to all of the defrauded investors. *Korn*, 456 F.2d at 1210.

All of the class members purchased DCI stock and relied on DCI's public statements and filings when they made the decision to purchase the stock. All of the class members' claims are based on the sections 10(b) and 20(a) of the Securities Exchange Act of 1934; 15 U.S.C. §§ 78j(b) and 78(t)(a); and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. This is sufficient to meet the commonality requirements. *Bresson*, 118 F.R.D. at 343; *Korn*, 456 F.2d at 1210.

*C. Typicality and Fairness/Adequacy of Representation*

Rule 23 also requires that the claims or defenses of the representative parties by typical of those of the class, and that the class representative be one who will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(3) and (4).

Defendants argue that Mr. de la Fuente is a typical plaintiff. They assert that Mr. de la Fuente was a frequent poster on investment web sites regarding DCI, and a promoter of DCI, therefore he was not in the dark about information relating to DCI.

■■■ The typicality requirement demands that the claims of the representative plaintiffs arise out of the same course of conduct and are based on the same legal theories of the claims of the other class members. *Shankroff*, 112 F.R.D. at 193. In the context of securities fraud, courts have recognized that typicality can be established by showing that the same misrepresentations in question were, at least in part, presented to all of the investors and all such investors purchased the stock during the relevant time

period. *Green,* 406 F.2d at 299. Mr. de la Fuente's internet postings do not demonstrate that he had any special knowledge that other investors, who did not follow these internet conversations, did not have. Furthermore, these internet postings were made before the Corzon allegations arose. Mr. de la Fuente's claims are typical of those of the class, and he alleges that he sustained losses as a result of the same materially false and misleading information made by DCI as the rest of the class. Thus, de la Fuente is typical of the members of the class, as are the other proposed class representatives. He has demonstrated that he is committed to prosecuting the case vigorously. In addition, co-lead and liaison counsel are qualified and experienced securities class action attorneys. *See* Firm Resumes Attached to the Declaration of Gregory Mark Nespole, Esq., filed on June 25, 2001.

Plaintiffs have therefore satisfied the typicality and fairness/adequacy of representation criteria.

### D. *Superiority*

Plaintiffs must also demonstrate that at least one of the elements of Rule 23(b) is satisfied. In this case, plaintiffs argue that their claims should be certified under Rule 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Visa Check/MasterMoney,* 280 F.3d at 133 (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). As discussed above, common questions of law or fact predominate. Thus, I focus here on the second requirement, that a class action be superior to other available methods for the fair and efficient adjudication of the controversy.

Plaintiffs argue that the only conceivable individual questions are the extent to which each class member relied on misrepresentations, and the determination of damages for each class member. Plaintiffs are correct that neither of these questions are sufficient to preclude class certification. Individual questions of reliance do not preclude class certification. *Korn,* 456 F.2d at 1212; *Dura–Bilt Corp.,* 89 F.R.D. at 96. Common

issues may still predominate even where there are individualized damage issues. *Visa Check/MasterMoney,* 280 F.3d at 139; *In re Indus. Diamonds Antitrust Litigation,* 167 F.R.D. 374, 382 (S.D.N.Y.1996) (individualized determination of damages does not preclude certification). Furthermore, there are no class members who have expressed an interest in individually controlling a separate action. *Korn,* 456 F.2d at 1214.

These claims do not seem to be ones that would be particularly difficult to manage as a class action. In any case, denying class certification under Rule 23(b)(3) on the basis that it would be unmanageable "is disfavored and 'should be the exception rather than the rule.'" *Visa Check/MasterMoney,* 280 F.3d at 140 (internal citations omitted). Record owners and other members of the Class may be identified from records maintained by DCI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

Plaintiffs' motion for class certification is granted for the class period from November 27, 2000 until December 6, 2000. The class consists of all persons who purchased and/or otherwise acquired DCI stock during this time period.

### Conclusion

For the foregoing reasons defendants' motion to dismiss is granted in part, and denied in part. Plaintiffs' motion for a continuance so that discovery may be conducted on the remaining allegations is granted, and defendants' partial motion for summary judgment is deferred until that discovery is completed. Plaintiffs' motion for class certification is granted, for the class of persons who purchased and/or otherwise acquired DCI stock from November 27, 2000 until December 6, 2000. The case against the accountant defendants, Schnitzer and Kondub P.C., and its principals, Richard S. Kondub and Ross T. Schnitzer is dismissed.

This constitutes the decision and order of the Court.